## SUPREME COURT.

PEOPLE ex rel. HOUSTON agt. MAYOR OF THE CITY OF NEW YORK.

The ordinances of the common council of New York city are not *public acts* in such sense that they can be noticed without being specially pleaded.

In an alternative mandamus the relator must set forth the *facts* on which he claims a right to relief.

The state laws in relation to the licensing of butchers, victualers, hackmen, stage drivers, &c. in the city of New York are branches of the law for the good government of the city, not parts of a revenue system. The right to license is a power to be exercised by the mayor according to his judgment; he violates, in refusing it, no *right* of an applicant, though the latter have complied with every condition of the statute.

The same result arrived at, on a review of the city ordinances on the same subject.

*New York Special Term, March* 1851. *Alternative Mandamus to the Mayor of the city of New York.* The writ shows that George Houston, the relator, is a citizen of the United States, a free citizen of this state, a freeman of the city of New York, over twenty-one years of age, and that he has for about five years been a driver of omnibuses in that city, and was licensed in 1849 as a stage driver, which license being about to expire, he applied to the defendant in February 1851, for another license, and tendered the legal fees; and that the mayor refused to grant the license. The defendant now moves to quash the mandamus.

MITCHELL, Justice.—It was properly admitted in the argument that the ordinances of the common council are not public acts; at least in such sense, that they can be noticed without being specially set forth in pleading. The mandamus in this case sets forth no ordinance, so that the rights of the relator depend, so far as any thing before the court shows, on the laws of the state only, and not on the ordinances of the city.

The case of the Commercial Bank of Albany vs. The Canal Commissioners (10 *Wend.* 25), shows clearly that in an alternative mandamus the relator must set forth the *facts* on which he claims a right to the relief sought, or the writ may be quashed (see p. 30, &c.).

This writ merely shows that the relator is a native citizen of the United States, a free citizen of this state, a freeman of the city, over twenty-one years of age, and that he has for about five years been a driver of omnibuses in the city, and was licensed on 19th October 1849, as a stage driver, by the mayor of the city, and paid the fee for his license, which expired in July last; that on 5th February last, he applied to the defendant for another license as a stage driver and tendered the legal fees, and that the mayor refused to grant the license.

The statutes referred to on the argument were those contained in 2 *R. L.* 1813, *p.* 446 § 272, *Laws of* 1833, *p.* 13, *and Laws of* 1846, *p.* 408.

The act of 1813 empowers the common council to make ordinances to regulate hackney coaches, and the owners and *drivers* thereof and their rates of fare, and requiring them to have a *license* from the mayor, and to pay therefor a sum not exceeding $5. The same section empowers the common council to pass ordinances and regulate or *prohibit* the sale of any article on Sunday; to *suppress* houses of gaming; to regulate the butchers and to *prohibit* them from carrying on their business at any other places than such as may be designated by the common council, and to *prohibit* any but *licensed* butchers from carrying on the business of butchers.

These regulations are all intended as part of a scheme for the good government of the city, and for the preservation of the public morals; they are none of them made for the sake of raising a revenue by a tax on licenses, nor merely to confer privileges on particular classes. The butchers and the hackmen and their drivers are to be licensed that they may the more effectually be under the control of the city authorities; certain other occupations for the sake of the public good are to be suppressed.

The act of 1833, pages 13, 14, § 20, 21, gave power to the common council to pass ordinances for regulating and *licensing* the keepers of ordinaries and victualing houses; and where fruits &c. might be sold, " and for the more effectual suppression of vice and immorality, and the *preserving of peace and good order* in said city;" and for *licensing* and otherwise regulating the use *of dirt* carts, and to prevent or regulate the use of fire-

People agt. Mayor of New York.

arms &c.; and made the offenders against such ordinances guilty of a misdemeanor and subject to a fine of $10.

The act of 1846, page 408, § 10, made the two sections last quoted from the act of 1833 applicable to cartmen, cabmen, hackney coachmen, *drivers* of *stages* and *omnibuses*, and to the vehicles driven by them, and to public porters and hand cartmen. These acts also are evidently branches of the law for the good government of the city, and not parts of a revenue system.

The license, therefore, is required not as a means of collecting a tax, but as a means of enforcing good order. While there are many ordinaries and victualing houses, conducted with the most perfect propriety, the legislature apprehended, probably, that others would hold out a sign of those businesses as a means of entrapping the stranger and of concealing some unlawful occupation. They also probably considered that the lives of passengers in omnibuses would be endangered if unskillful or disorderly drivers were employed; that the lives of foot passengers would also be in danger, and that collisions would be likely to occur among the numerous vehicles that crowd our streets; that strangers also might be imposed on and misled.

All these are matters which would induce the legislature to limit the occupation of drivers of public conveyances to those only who should be approved by the licensing power. If the mayor, therefore, has the right to license, it must be a power to be exercised according to his judgment of what is proper, and that judgment he exercises when he refuses to give the license. He may refuse because in his opinion there may already be too many drivers licensed, or because the applicant may not be a suitable person, and he is not bound to assign reasons for his decision. If he abuses his power he may be impeached.

This is not a question whether the relator shall be allowed to labor or not, as it was argued to be, but whether he shall be allowed to labor in a special business to which the licensed or privileged alone are admitted. If no license is needed, to follow the business, and it is open to all, then (as was conceded) there is no need of a mandamus.

These public acts, therefore, do not show that the granting of a license to such a person as the relator, is a matter of right in

him, nor that the mayor is the person who shall grant them. The mandamus, therefore, is bad on its face.

The counsel, however, on both sides argued as to the effect of the ordinances, as if they were inserted in the mandamus by proper amendments. These are the Ordinances of 1839, chapter 59, pages 311, 312, 313; Revised Ordinances of 1845, pages 470, 472, 473, § 8, 9, 10, 11; and volume 16 Proceedings of Boards of Aldermen and Assistants, passed May 1848.

Under these ordinances the mayor is authorized and required to issue licenses, and *to revoke the same at his pleasure,* to as many persons *as he may think* proper to keep and *use* stage coaches, &c.; and no person is to keep or *drive* any such stage coach, &c. without being *licensed* as aforesaid under the penalty of $50; and no person is to *drive* any such stage unless he be twenty-one years of age, and have obtained *a license* from the mayor, under a penalty of $10 for every such offence; and the mayor is *authorized* to grant licenses to *drivers* of such coaches, &c., as often *as may be necessary,* and to suspend and revoke the same, whenever he *may deem it expedient.*

Thus the mayor is expressly authorized to revoke or suspend licenses to drivers whenever *he* may *deem* it expedient, and grant them as often as may be necessary. Some one must judge as to when they are necessary, and as he is to grant them, he alone must judge as to the propriety of granting them; and he alone is expressly authorized to revoke them. If one has power to license, and then when he deems it expedient to *revoke* the license, the absolute control as to the revocation seems almost necessarily to make him the sole judge of the propriety of licensing; for if he could immediately revoke on granting the license, it would be idle *to grant it.* A license from its nature also implies the idea of favor to a preferred party, and not of a thing which he could originally obtain as a right. Thus innkeepers and keepers of taverns and groceries are licensed to sell liquors; yet it is believed that no one has as yet maintained that any one who demands a license and tenders the legal fees can obtain one for any of those employments (see 1 *R. S.* 678). When the legislature means that every applicant should have a license they say so; thus in the case of peddlers of foreign goods it is made ex-

pressly the duty of the proper officer to grant the license to every such applicant (1 *R. S.* 575, § 1 to 4). But no such duty is imposed on the mayor; on the contrary, he is made the judge of the propriety of granting, refusing or revoking a license, and with that judgment or discretion, as it may be called, the courts can not interfere. If our laws were that no man should follow any business whatever without a license, and paying for it, then it might well be argued that the license was required only for the sake of the tax, and that on payment of the tax the license should be granted. But if such were the general law and there were such special laws as exist in the case, the intention would still be clear that in this class of cases the licensing power was discretionary.

The motion to quash the alternative mandamus is granted, with $10 costs of the motion; but to enable the relator to carry this case up to a higher court, leave is given to him to amend the writ by inserting the ordinances referred to, and any others which he may deem relevant, and making up a record containing the writ so amended, a return to be filed by the defendant declaring that he deemed it inexpedient to grant the license prayed for, and a demurrer and joinder in demurrer. The relator will give notice in writing in ten days after service of notice of the order, whether he elects to make up such record.