(86 Misc. Rep. 417)

### PEOPLE v. MILNE.

(Court of General Sessions, New York County. July, 1914.)

1. LICENSES (§ 42*) — VIOLATION OF LICENSE ORDINANCE — SUFFICIENCY OF EVIDENCE.

     Evidence *held* to sustain a conviction of plying a public hack for hire on the streets without first obtaining a license, as required by the Public Hack Ordinance of the city of New York, approved June 2, 1913 (article 3, § 1).

     [Ed. Note.—For other cases, see Licenses, Cent. Dig. §§ 88–95; Dec. Dig. § 42.*]

2. MUNICIPAL CORPORATIONS (§ 642*)—VIOLATION OF ORDINANCE—EVIDENCE —APPEAL.

     That the appellate court may disbelieve the evidence on which a magistrate has found a defendant guilty of violating a city ordinance will not authorize a reversal.

     [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1412–1415; Dec. Dig. § 642.*]

---

For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. LICENSES (§ 14*) — LICENSE ORDINANCE — CONSTRUCTION — "PLYING FOR HIRE."

A "plying for hire," within the meaning of the Public Hack Ordinance of the city of New York, approved June 2, 1913 (article 3, § 1), providing that no public hack shall ply for hire without a license, involves a conjunction of a purpose to accept, whenever the cab is vacant and unengaged, persons who may offer themselves as passengers for hire, coupled with conduct which evidences such purpose.

[Ed. Note.—For other cases, see Licenses, Cent. Dig. §§ 25–29; Dec. Dig. § 14.*]

Appeal from Magistrate's Court.

Edward S. Milne was convicted in Magistrate's Court of plying a public hack for hire without first obtaining a license, in violation of a municipal ordinance, and appeals. Affirmed.

Wing & Wing, of New York City, for appellant.

Charles S. Whitman, Dist. Atty., of New York City (James E. Smith, Deputy Asst. Dist. Atty., of Olean, of counsel), for the People.

CRAIN, J. [1] The defendant appeals from a judgment of a Magistrate's Court convicting him of a violation of article 3, § 1, of the public hack ordinance of the city of New York, adopted May 27, 1913, approved June 2, 1913. The material part of this ordinance provides that no public hack shall ply for hire upon the streets of the city of New York without first obtaining a license from the bureau of licenses.

The complainant was deputy chief of the license bureau. He testified in substance that at 1:20 a. m. April 7, 1914, he saw a yellow taxicab standing at the curb on the westerly side of Broadway in front of the Broadway entrance of Churchill's restaurant, situated on the southwest corner of Broadway and Forty-Ninth street in the county of New York; that a portion of such taxicab, namely, its rear wheels, were in front of such main entrance and its front wheels south of such main entrance; that the defendant was the chauffeur on and operating such taxicab; that the complainant spoke to the defendant and said; "You have been standing here seven minutes. How long do you intend to stand here with the flag up, the taximeter in a vacant position?" and that the defendant answered, "I intend to stand here about a minute;" that the defendant then swung the cab out from the curb and went down Broadway to Forty-Eighth street; that at Forty-Eighth street he swung his taxicab around, crossed the Broadway car tracks, and, heading uptown, stopped in front of the door of Rector's restaurant on the northeast corner of Forty-Eighth street and Broadway; that the complainant again approached the defendant; that the defendant looked at the complainant and drove his car off, going uptown to Forty-Ninth street, where, swinging around, he drove again to the door of Churchill's restaurant and stopped his taxicab in substantially the position in which it was when the complainant first saw him; that the complainant again approached the defendant; and that the defendant saw him coming and started to drive away again, and complainant stopped him.

On cross-examination complainant said that the defendant did not speak to any starter at Churchill's or Rector's and that the starter did not come out at Churchill's at all. The testimony of the complainant was in part corroborated by that of another witness called for the people, who, in addition, testified that the defendant's taxicab was unlicensed, and that the place where the defendant was standing in front of Churchill's was a public hack stand. This latter statement, however, appears from the record to be erroneous; the fact being, as disclosed by the subsequent statement made by the complainant, that a portion of the defendant's cab, as first seen by the complainant, was standing on a part of the space set apart for public hacks drawn by horses, and that a portion was not upon a public hack stand, and that no part of it was upon any public hack stand designated for motor vehicles.

It appeared by testimony offered on the part of the defendant that the taxicab in question belonged to what is known as the Yellow Taxicab Company, which had more than 100 taxicabs at a certain garage; that this company had what is known as a starter at Churchill's restaurant; that this starter received, through the head waiter, a call for a taxicab; that because of this call he summoned at 1:12 a taxicab from the garage of the company; that, responsive to such call, the taxicab operated by the defendant arrived at the door of Churchill's restaurant about 1:13 a. m.; that the starter then spoke to the defendant at the curb, handed him a slip customarily used by the company as the paper upon which a chauffeur was to record the fare paid by a customer, and which he was to turn over to the company at the time of paying such company such fare; that such starter informed the defendant that he had a call inside from one of the head waiters, and instructed him to wait a few minutes, expecting the party to come right out; that the defendant waited upward of seven minutes, and that because he saw the complainant approach him, and not wishing to have any trouble, moved on; that the defendant pursued substantially the course testified to by the complainant, except that he denied that he had stopped at the curb in front of Rector's.

The only points, therefore, as to which there was a conflict in the testimony were whether the defendant and the starter spoke together, and whether the defendant stopped in front of Rector's. The learned magistrate says that he credited the testimony of the complainant and discredited the testimony to the effect that the defendant had been summoned by the starter for the purpose of having the taxicab used for hire by a theretofore ascertained person.

[2] The magistrate saw and heard the witnesses, and this appellate court cannot predicate error upon his disbelief of certain testimony. Moreover, the record amply establishes that such disbelief was not arbitrary but reasonable. If the defendant's version that there was an ascertained and accepted customer for the defendant's taxicab had been the true one, it would have been the natural, and in fact almost the necessary, thing for the starter of the company and the defendant to have held communication during the period of up-

ward of seven minutes that the defendant's cab was in front of. Churchill's, but the testimony of the starter and of the defendant that they did is flatly contradicted by the concurring testimony of the complainant and another that there was no such communication. If the defendant and his fellow employé testified falsely in this regard, it is a circumstance. discrediting their entire testimony. The alleged customer was moreover not produced as a witness, although he was presumably inside of Churchill's at the time when the defendant was served by the complainant in this case with a summons, and the importance of the testimony of such alleged customer to the defendant, and incidentally to the defendant's employer, the Yellow Taxicab Company, must have been apparent both to the defendant and to his fellow employé, the starter. Indeed, no effort appears to have been made on the part of the starter to find such alleged customer. The waiter, who is said to have informed the starter, was not produced as a witness nor his absence accounted for. The employé at the garage (if one there was), who received the alleged telephone call for a taxicab, was not produced. No explanation was attempted of why the defendant had and kept his signal flag at "vacant." The numerals on the slip said to have been given to the defendant by the starter, namely 4—6—14, presumably intended to indicate the month, day, and year, namely, April, fourth month, 6, sixth day, and 14 for the year 1914, do not correspond with the date of the occurrence, and finally what amounted to the defendant's flight at the approach of the complainant, who was known to the defendant to be an officer charged with the enforcement of the ordinance said to have been violated by the defendant, were each and all significant circumstances discrediting the defense. It remains, therefore, only to inquire whether there was a sufficiency of evidence to sustain the charge.

Under the ordinance in question to warrant a conviction, it is necessary to establish by legal evidence that upon the occasion referred to in the complaint, upon which the proceeding was initiated, the defendant plied for hire a public hack upon a street in the city of New York without first obtaining the license to do so, referred to in the ordinance. Was the defendant engaged in plying for hire? If so, was he engaged in plying for hire a public hack? If so, was he engaged in doing this upon a street in the city of New York? If so, had he the license to do this referred to in the ordinance? These are the questions to be determined.

The absence of such a license was testified to and conceded. There was no dispute that at the time of his arrest, and upon the occasion referred to in the complaint in this proceeding, the defendant was a chauffeur on an automobile on a public street in the city of New York. Was this automobile a public hack, within the meaning of the ordinance? This depends upon the character of the vehicle and the use to which at the time it was being put. It was a vehicle for the carriage of passengers. It had a taximeter intended to register and record amounts, dependent upon time and distance which persons, occupying it as passengers for hire, in the absence of special agree-

ment, might lawfully be required to pay for its use. It belonged to and was operated by a company whose business was the ownership and operation of passenger carrying motor vehicles for hire. It was what was commonly known as a taxicab. It was of the distinctive yellow color adopted by that company, doubtless to distinguish its vehicles, and by which color the company itself was known. It was intended to advertise by its color that it was not a vehicle for the exclusive use of those owning it, but likewise for the use of those who from time to time might hire it from its owners. It was equipped with a movable flag or device, which, when up, displayed the word "vacant." It was thus manifestly a vehicle structurally suited to use as a public hack, and if, at the times referred to in the complaint, it was actually subject to hire by any one who might wish to hire it, and who should hail it for that purpose from the public streets, it was at such times a public hack.

[3] The conjunction of a given purpose with given conduct appropriate to effectuate it constitutes "a plying for hire," within the meaning of the ordinance, namely, the conjunction of the purpose to accept whenever the cab is vacant and unengaged persons who may offer themselves as passengers for hire, coupled with conduct which evidences this purpose; as, for example, the placing of such cab on a public street where it is accessible to those who may wish to hire it, and the solicitation of passengers for hire by the one operating it, by word, act, or by the exhibition of appropriate signs or devices. In this case the defendant's purpose was inferable from his conduct, and his conduct was conducive to the effectuation of his purpose. Being actually hired is not the test of whether or not there is a plying for hire. One may ply for hire without being hired.

At the times referred to in the complaint the defendant was the chauffeur and operator of the vehicle, and certainly in the absence of testimony credited, tending to show that the defendant's control of the car was limited by his employment to a special purpose, or that as between himself and his employer he was not empowered to permit it to be hired without the intervention of some other representative of the company owning it while upon the public streets, the defendant's conduct may be considered as bearing upon the question as to whether the vehicle in question was, at the times named in the complaint, so for hire, and therefore a public hack. So considered, we find him with his vehicle standing in part upon a public hack stand for horse cabs and in part not upon any public hack stand at a curb, not engaged in taking on or discharging passengers, but remaining stationary for about seven minutes with an upraised flag on his vehicle displaying the word "vacant," moving away when approached by one whom he recognized as an officer, stopping again in front of another building, without there taking on or discharging any passenger, moving away from there again when approached by such officer, stopping for a second time at substantially the point where he was first seen, and again starting to move away from there when again approached by such officer. The distance which the defendant traversed was probably about the minimum distance which, under the

traffic regulations, he could cover if he put his cab in motion at all, and, so far as he did move for that distance up and down Broadway, it is plain that his dominant motive was not to secure by that means passengers, but to avoid arrest. He moved, in other words, because he was frightened, and it is a permissible inference that he was frightened because he doubted whether there was inside of Churchill's restaurant, while he was standing in front of it, any person who had previously ordered for hire a taxicab from his company. He was apprehensive at least that a charge like the present one might be preferred against him, and the plying for hire which he did consisted in going to Churchill's, not to be there used by a theretofore ascertained passenger, but to be there subject to use by any one who might, while his taxicab was there, elect to hire it. With the consent of his employers, it was lawful for him to leave with his taxicab his employers' garage. With such consent it was lawful for him to proceed from that garage to the doorway of Churchill's, and with such consent it was lawful for him to stop in such doorway, always provided he did not unduly obstruct it, unduly interfere with a place set apart as a public hack stand for horse cabs, or deceptively occupy a public hack stand there set apart for motor vehicles. But he had no right, under the ordinance, to ply for promiscuous hire, and when he kept the flag of his taxicab in an upright position, with the word "vacant" disclosed to the public, he solicited, through the medium of this sign, as truly passengers as though he had called out aloud. It was an assertion by conduct that the vehicle was for public hire, and, in conjunction with the movement of the vehicle, constituted a plying for hire, within the ordinance.

A taxicab, not a public hack, can doubtless lawfully be called for an ascertained patron or hirer to a given place, and may proceed to such place and stop there, although such place be a public hack stand, and remain there subject to the orders of such person so engaging it, provided that no unreasonable use be made by such taxicab of such public stand, and provided that such taxicab is not subject to hire by any person other than such ascertained person or hirer from the time that it is called until the time when it returns to the garage in which it is kept; and, for the purpose of securing customers, taxicab companies may, by agreement, keep representatives in hotels, public restaurants, and other places, but such representatives cannot be permitted to evade the ordinance in question by summoning taxicabs, not public hacks, from such garages to such places ostensibly for ascertained patrons or hirers, but in reality without such, but with a view to having them hired by any one from the public streets.

These considerations lead to the affirmance of the judgment of conviction.

Judgment affirmed.