CITY MAGISTRATE'S COURT—NEW YORK,

November, 1914.

# THE PEOPLE v. HARRY A. GREENE.

# THE PEOPLE v. JOHN STEPHENSON.

(1.) PUBLIC HACK ORDINANCE—SIGHTSEEING CAR.

Sightseeing cars are included in the definition of "public hack" and if unlicensed are forbidden to solicit public patronage from the streets.

(2.) SAME.

Defendant Greene, the starter of the sightseeing car, was charged with "soliciting passengers for a public hack, etc.," not being a driver sitting upon the driver's box. *Held*, that upon the evidence he could not be found guilty of soliciting public patronage.

(3.) SAME.

Defendant Stephenson, the driver, was talking with one of the lecturers some distance away while Greene accosted people. *Held*, that he was guilty as he was there as the operator or driver of that particular car, and it was his duty to prevent any act in regard to the vehicle which the ordinance forbids.

*Frank L. Polk, Corporation Counsel,* with *Assistant Corporation Counsel George P. Nicholson,* for the People;

*Wing & Wing (Arthur K. Wing* and *Frank ·H. Girrodette* of counsel) for the defendants.

DEUEL, C. M.:

Upon the same state of facts the above defendants were separately charged with violating different provisions of the Public Hack Ordinance. Under article 7, section 7, Greene is charged with having solicited passengers from the streets and highways

for the sightseeing car operated by Stephenson, who, under article 3, section 10, is charged with having engaged " in the business of public hacking· at Twenty-third street and Broadway without first procuring a public hack license."

By stipulation, entered on the record, the two cases were tried together.

The vehicle, in connection with which the alleged offendings were committed, was a sightseeing car which the ordinance defines to be (art. 1) " a motor driven vehicle designed to carry seven or more persons from a fixed locality to points of interest about the city." It was one of ten owned by the Green Car Sightseeing Company and operated by the Swastika Tours Company, whereof defendant Green was the " starter and general information man " and defendant Stephenson an operator.

It appears that this particular sightseeing business has been in operation for eight years, with Broadway and Twenty-third street as a starting point, where the managing company maintains offices for the sale of sightseeing, railway and steamboat tickets. It also has offices in one of the city hotels for the sale of its sightseeing tickets, and they are likewise sold by tourist agencies elsewhere. All tickets not sold at the main office are required to be there presented and exchanged for regular trip tickets, which are numbered so as to identify the purchaser's seat in the car.

In August, 1914, when the present ordinance went into effect, some changes were made in its business methods, but what these changes were, other than stopping financial transactions on the street, the evidence does not disclose. It is to be inferred, however, that the object was to take the company's sightseeing cars out of the provisions and requirements of the ordinance and thus preserve the business as built up with the same starting point, which is not one of the designated hack stands. Sightseeing cars are included in the definition of " public hack," and

if unlicensed are forbidden to solicit public patronage from the streets. If licensed they become " public hacks," and the one provision the owner of the car in question, doubtless, hoped to avoid was section 5 of article 7, which forbids public hacks, while waiting employment, to stand on any public street or place other than at or upon a public hack stand.

Excluding the testimony of the complaining inspector and considering only this waiting car in front of offices provided with display signs advertising the sightseeing trips and a man on the sidewalk between the car and the office to answer all questions passersby might ask, the extreme narrowness of the margin separating such vehicles from the provisions of the ordinance is quite apparent. Especially is this true in the light of the decision of People v. Milne (86 Misc., 417). Judge Crain therein says:

" The conjunction of a given purpose with given conduct appropriate to effectuate it constitutes ' a plying for hire ' within the meaning of the ordinance, namely, the conjunction of the purpose to accept whenever the cab is vacant and unengaged persons who may offer themselves as passengers for hire, coupled with conduct which evidences this purpose, as, for example, the placing of such cab on a public street where it is accessible to those who may wish to hire it, and the solicitation of passengers for hire by the one operating it by word, act or by the exhibition of appropriate signs or devices."

The corporation counsel, the legal adviser of the bureau of licenses, was not present at the trial of the present cases and evidently was not consulted as to the form the prosceution should take, otherwise some of the complications presented probably would have been avoided. The more appropriate and less complicated proceeding would have been against the managing and responsible corporation directly, or to have included it in the present charges. The corporation counsel appeared in the case only after trial, and then because the court, anticipat-

ing some of the complications, asked for briefs. The first of this nature is presented in the case against Greene. He is charged under section 7 of article 7, which reads:

" No person shall solicit passengers for a public hack or hacks upon the streets and highways of the City of New York except the driver of a public hack when sitting upon the driver's box of his vehicle."

When, if at all, did the sightseeing car in question become a public hack making it an offense for some one other than the driver sitting upon his box to solicit patronage? There is no evidence that it was a public hack when it drew up along the curb at Broadway and Twenty-third street on the day in question and, all things considered, I must conclude it was not then of that character. It must be evident, therefore, that Greene committed no offense in speaking as he did to the person first addressed. If he be convicted at all it must be on the assumption that his first solicitation converted the car into a public hack, and further soliciting made him criminally liable. Does this section of the ordinance contemplate any such roundabout method to create a crime? Are our laws so deficient in direct means for adjudging criminality that we must now resort to circumlocution? The vehicle intended to be covered by the section was an actual public hack, not one needing the judgment of the court to make it such. The evident purpose of this section was to minimize the discomforts of a potential nuisance to property owners adjacent to public hackstands, and, as well, to the public having occasion to pass or repass them on the sidewalk. Therefore drivers must be seated on the box, and to avoid unseemly scrambles for patronage on the sidewalks, there must be no other solicitors.

Nevertheless, as a legal corollary attending an act *malum prohibitum*, if defendant Greene actually solicited public patronage as charged, some one was liable criminally, and it is necessary to ascertain whether Stephenson is included.

The complaining inspector had Greene and the car under observation for ten minutes, and testifies that Greene " approached people going up and down Broadway without being accosted by them, saying: ' Sightseeing car; up and down Broadway; this car leaves at 2 o'clock,' and I noticed him to do that about ten times through the ten minutes."

Greene denies all this except the word " sightseeing." He says he was " walking back and forth, and anybody that looked as if they were looking for the cars I would ask them ' Sightseeing? ' and if they had any tickets from the hotels I would direct them to the office." He further said he did not do even that unless the persons " looked toward the office or looked toward me." If the persons thus addressed had tickets from the hotels, he told them to go into the office and have them exchanged, and if they asked where they could get a ticket " I told them to go into the office."

His duties were " to see that everybody is seated before the tour leaves and assign them to their proper seats in the cars, and collect tickets and see that the cars are started on time."

As between the two witnesses I am convinced that the complaining inspector testified truthfully. Nevertheless, upon the testimony of Greene alone in connection with the presence of the waiting car and other actual surroundings, I am of the opinion that a conclusion of soliciting public patronage safely can be predicated. It is common knowledge that the ordinary hackman usually invites negotiations with " Cab, sir? " and it is immaterial whether it is expressed with the rising or falling inflection. To invite business negotiations on the street by any means is to solicit patronage. The bootblack, as all persons using our sidewalks know, does it by the one word " shine." If Greene was there simply to give information to ticket holders, his natural place would have been near the entrance to the offices, and not walking back and forth on the sidewalk saluting persons with " Sightseeing? " There were plenty of signs to direct the public to the offices.

Defendant Stephenson admits being present during all the time, practically, that the inspector was making observations. " To be candid," said he, " I was standing at the lamp-post talking to one of the lecturers and I paid no attention to him (Greene) at all." Q. " During that time did you hear him say anything to anyone? " A. " No, sir, I did not."

Whether he saw or did not see what Greene was doing, or whether he heard or did not hear what Greene was saying, is entirely immaterial. He was there as the operator or driver of that particular car, but instead of protecting himself by preventing the soliciting of public patronage from the streets, he was negligently talking with one of the lecturers some distance away. The section under which he is prosecuted imposes a criminal penalty upon " any owner or driver of a vehicle not licensed  *  *  *  who engages in the business of a public hack as defined hereby," and that penalty carries with it a duty to prevent any act in relation to the vehicle in his charge which the ordinance forbids. The offense being *malum prohibitum*, neither knowledge that the act constituting it had been committed nor criminal intent in its commission is an essential ingredient (People v. D'Antonia, 150 App. Div. 109 ). In that case the defendant was in California when the act for which he was convicted was committed in the State of New York.

It is true, as defendant's counsel contends, that at the time the summons was served on Stephenson the complaining inspector had no legal evidence that he was the operator of that particular car, but the inspector waited until Stephenson took his place as the operator and saw him start the car on its way. If he had omitted to take the car out, there could be no conviction. By his own act, however, after the summons was served, he supplied the necessary link to make him criminally liable.

It necessarily follows that defendant Greene must be acquitted and defendant Stephenson should be convicted.

## NOTE ON PUBLIC HACKS.

The granting of licenses to hackmen and stage-drivers in the City of New York is a matter of judicial discretion; the mayor cannot be compelled to grant a license by mandamus. People v. New York, 7 How. Pr. 81.

It is no breach of ordinance imposing a penalty upon the drivers of hacks, etc., occupying any other than certain designated places, to stand on the private grounds of a railroad company, by its license, to await the arrival of passenger trains. Buffalo v. Mulchady, Sheld. 431.

A City ordinance prohibiting " All hacks, baggage wagons and public conveyances," from standing in certain specified parts of the city does not apply to a hotel omnibus used to convey guests free of charge to and from the different railroad stations. Oswego v. Collins, 38 Hun, 171.

The lessee of a hotel may maintain an action to enjoin the use of the highway in front of and adjoining his premises as a hackstand. McCaffrey v. Smith, 41 Hun, 117.

The plaintiff was granted by a railroad company the exclusive privilege of soliciting and obtaining passengers on the grounds of the railroad company's station. *Held*, that this contract is not in conflict with R. R. L. Sec. 34 as amd. by L. 1892, ch. 676, forbidding the giving of preferences in railway stations to one of two competing parties. N. Y. C. & H. R. R. R. Co. v. Warren, 31 Misc. 571, 64 N. Y. Supp. 781.

L. 1902, Ch. 506, Sec. 40, forbidding hackman in the village of Saratoga Springs to "permit any horse or vehicle to stand in any public street of said village for hire, or to walk or drive through the street soliciting patronage" is constitutional. People ex rel. Van Norder v. Sewer, etc., Com., 90 App. Div. 555; 86 N. Y. Supp. 445.

Where a railroad company granted to a hackman, the exclusive right to go on the station grounds and solicit passengers, an injunction will lie to prevent other persons from soliciting on the grounds, but others cannot be restrained from delivering passengers on the station grounds, or from coming upon the grounds to receive persons who have previously employed them to meet them at the station. N. Y. C. &. H. R. R. Co. v. Warren, 31 Misc. 571, 64 N. Y. Supp. 781.