Universal Film Manufacturing Co., Plaintiff, *v.* George H. Bell, as Commissioner of Licenses of the City of New York, Defendant.*

(Supreme Court, New York Special Term, June, 1917.)

Injunctions — power of commissioner of licenses of city of New York.

> A motion to restrain the commissioner of licenses of the city of New York from interfering with the presentation of the motion picture photoplay entitled "The Hand that Rocks the Cradle," which deals with the subject of birth control, denied.

Motion for an injunction.

Stanchfield & Levy (John B. Stanchfield, of counsel), for plaintiff.

Lamar Hardy, corporation counsel, for city of New York.

Greenbaum, J. This is a motion brought by plaintiff to enjoin the commissioner of licenses of the city of New York from interfering with the presentation of a certain motion picture photoplay entitled " The Hand That Rocks the Cradle " and from canceling the license of any theatre in which such play may be produced. The parties do not differ as to what the scenario of the play is and what the pictures portray, and it will suffice for the purpose of this discussion to state that the play deals with the subject of birth control and features as a heroine or a martyr the wife of a physician of high standing, who, with full knowledge that what she was doing was contrary to existing law, has been convicted for expounding methods of contraconception to miscellaneous audiences of women in violation of the criminal law. Scenes are depicted between the heroine and her husband and others which are designed to show the effect upon the poor in the raising of large families and

* See page 267, *supra.*— [Repr.

how mothers of poor families were benefited by the unlawful knowledge imparted to them by the heroine and how the rich or well-to-do manage to escape the inconveniences of large families. The plaintiff justifies the production upon the ground that the play is merely an argument in favor of the repeal of the existing law, which forbids the imparting of information on the subject of birth control, and that under a republican form of government it is entirely proper to educate the people by arguments for and against the wisdom of a given piece of legislation. By chapter 475 of the Laws of 1914 (Greater N. Y. Charter § 641) the defendant commissioner of licenses is vested with the power to issue, renew and revoke licenses in relation to theatres. Under chapter 3, article 2, of the Code of Ordinances of the city of New York, section 41, the power of inspection of motion picture theatres is vested in the commissioner, and the inspectors of the department are required to investigate the character of exhibitions in these theatres and to report to the commissioner any offense against " morality, decency or public welfare," committed in said exhibitions. Pursuant to chapter 14, article 1, section 5, of the Code of Ordinances, specific power is conferred upon the commissioner " to hear and determine complaints against licensees and to suspend or revoke any license or permit issued by him under any provision of this ordinance." In *People ex rel. Schwab* v. *Grant,* 126 N. Y. 473, 482, which involved the right of the mayor of the city of New York to refuse the relator a license as auctioneer, the court significantly said: " No one, we think, could reasonably claim that the exercise of the discretion of the mayor with respect to the subject of granting such licenses, could be subjected to supervision or control. The powers exercised, by public officers over the sub-

jects indicated have been general throughout the state in municipal corporations, and most salutary in their operation, and constitute the only protection afforded large communities from the evils of immoral and vicious exhibitions and the prosecution of employments tending to disturb the public health, peace and comfort. * * * A determination of this appeal, which should have the effect of denying the mayor's discretion in the exercise of the power conferred by these provisions, would, we think, be most unwise and impolitic and subversive of the policy of the charter, as well as the best interests of the municipality where it is exercised. The practice of nearly a century in this state has taught us that there is little to fear from an abuse of this power, for during that time we have yet to learn of an instance where it has been perverted for improper purposes, or excited public condemnation or disapproval." In *People* v. *Mayor of the City of N. Y.,* 7 How. Pr. 81, 84, which discussed the power of the mayor to refuse relator a license as a stage driver, the court said: " Thus the mayor is expressly authorized to revoke or suspend licenses to drivers whenever he may deem it expedient, and grant them as often as may be necessary. Some one must judge as to when they are necessary, and as he is to grant them, he alone must judge as to the propriety of granting them; and he alone is expressly authorized to revoke them. If one has power to license, and then when he deems it expedient to revoke the license, the absolute control as to the revocation seems almost necessarily to make him the sole judge of the propriety of licensing; for if he could immediately revoke on granting the license, it would be idle to grant it. A license from its nature also implies the idea of favor to a preferred party, and not of a thing which he could originally obtain as a right. Thus innkeepers

of taverns and groceries are licensed to sell liquors; yet it is believed that no one has as yet maintained that any one who demands a license and tenders the legal fees can obtain one for any of those employments (see 1 R. S. 678). When the legislature means that every applicant should have a license they say so; thus in the case of peddlers of foreign goods it is made expressly the duty of the proper officer to grant the license to every such applicant (1 R. S. 575, secs. 1 to 4). But no such duty is imposed on the mayor; on the contrary, he is made the judge of the propriety of granting, refusing or revoking a license, and with that judgment or discretion, as it may be called, the courts cannot interfere.'' See, also, *Edelstein* v. *Bell,* 91 Misc. Rep. 620; *Ivan Film Productions* v. *Bell,* N. Y. L. J., Dec. 5, 1916. It is thus clear that the defendant is vested with discretionary power in respect to licensing motion picture theatres. The able and learned counsel for the plaintiff has not questioned the constitutional power of the legislature to confer this discretionary power upon the commissioner of licenses. It may, however, not be amiss in this connection to take cognizance of the case of *People* v. *King,* 110 N. Y. 418, 423, wherein the court, per Andrews, J., says: '' The statutes abound in examples of legislation limiting or regulating the use of private property, restraining freedom of personal action or controlling individual conduct, which by common consent, do not transcend the limitation of the Constitution. This legislation is under what, for lack of a better name, is called the police power of the state, a power incapable of exact definition, but the existence of which is essential to every well ordered government. By means of this power the legislature exercises a supervision over matters involving the common weal and enforces the observance, by each individual member of society, of the duties which he owes to

others and to the community at large.  It may be exerted whenever necessary to secure the peace, good order, health, morals and general welfare of the community, and the propriety of its exercise within constitutional limits is purely a matter of legislative discretion with which the courts cannot interfere.'' Although the plaintiff does not attack the constitutionality of the statute which empowers the commissioner of licenses to grant or revoke licenses for theatres and plays, he does insist that the play is in the nature of an education of the people.  As to the arguments of the learned counsel for the plaintiff for and against the repeal of the statute, if he has in mind the constitutional provision which accords to every citizen the '' freedom to speak, write and publish his sentiments on all subjects, being responsible for the abuse of all that right,'' and which provides that '' no law shall be passed to restrain or abridge the liberty of speech or of the press,'' it should be remembered that the defendant has not attempted to interfere with any such constitutional right of the citizen.  We are dealing with a place of amusement conducted by the plaintiff corporation for commercial benefits to itself and for the purpose of realizing profit, and whose right to exhibit plays is not an absolute one, but in the nature of a privilege granted by the state.  It is almost a commonplace to say that no believer in a republican form of government will deny the right of peaceful and honest discussion of any question which may be properly the subject of legislative enactment.  It may also be well to bear in mind that republican governments are governments of laws which emanate from the people, and that the integrity and perpetuity of such governments must depend upon a faithful observance of the laws in force at a given time.  No individual may set himself above the law or defy the law.  A change in the law

may be effected only by the lawful methods provided by law. In the case at bar the physician's wife, a confessed violator of the law, is represented as a martyr and held up to the admiration and applause of promiscuous audiences because of her violation of the law upon the specious and pernicious plea that the law which she violated has no place upon the statute books. If the ignorant and uninformed are to be educated by being told that the laws which they do not like may be defied, and that lawbreakers deserve to be glorified as such, there would be a sorry future in store for human liberty. It has been urged that plays are often produced in which crime is portrayed without shocking the sensibilities of the auditors or observers. We have here, however, an exhibition which, it is claimed, is produced for the purpose of accomplishing the repeal of an objectionable law. In the presentation of the arguments against the statute a violator of the very law which it is sought to repeal is exhibited as a heroine or martyr because of her defiance of that law. It is true that plays have been produced and exhibited in which great criminals are the principal figures. Instances may be cited in which the lives of such notorious historical and fictional bandits as Robin Hood, Captain Kidd and men of the type of Dick Turpin have been staged, but such productions are not presented for the purpose of accomplishing the repeal of the laws forbidding murder, robbery or piracy. Reference to this objectionable feature of the production has not been made for the purpose of finding a justification for the commissioner's action, since the court is of opinion that he is not required to state the reasons which prompted his official action, but merely because it tends to illustrate what, among other things, may have influenced him. Indeed it is wholly immaterial what the court's opinion may be as to the wisdom of the commissioner's action as long as he acted in good

faith. The court cannot act as a commissioner of licenses. The commissioner did not act arbitrarily or capriciously, and it is but fair to state that the affidavits submitted indicate that he based his opinion of the character of the production after he had thoroughly familiarized himself with its theme, the pictures and the words employed in its presentation and considered the effect it was likely to produce upon those who witness it. Among the answering affidavits a number of them are made by persons of high standing and by representatives of civic societies to the effect that the play is *contra bonos mores.* Whether their opinions are correct or not is not necessary for the court to pass upon, but they are merely referred to as bearing upon the question of whether or not the defendant has abused his discretion. Under the statute the commissioner is to consider whether the play is " immoral, indecent or against the public welfare." One of the definitions of the word " decency " found in the Century Dictionary is " propriety of action, speech, dress, etc." What constitutes decency, or, in other words, what is propriety of action, must be determined by standards in vogue among highly civilized peoples and not those that may prevail among the Fiji or South Sea Islanders. Lewd men or women have no sense of decency, and what may be regarded as decent by one person may not be thus regarded by another. The discretion honestly exercised by the commissioner in the discharge of his duties may not be overthrown by the court excepting only where it may be shown that his actions were influenced by corrupt or dishonest considerations, the burden of proving which rests upon the moving party. The preliminary injunction heretofore granted must be vacated and the motion for a continuance of the injunction denied.

Motion denied.