[No. 18409.  Department Two.  May 9, 1924.]

THE STATE OF WASHINGTON, *on the Relation of Ernest C. Savage, Respondent,* v. ANDY DEAN, *Appellant.*

THE STATE OF WASHINGTON, *on the Relation of Ernest C. Savage, Respondent,* v. BATTISTA MARCHETTI, *Appellant.*[1]

CARRIERS (3, 4)—REGULATION—CERTIFICATES OF NECESSITY—TAXI-CAB SERVICE—VIOLATION OF INJUNCTION—STATUTES—CONSTRUCTION. Upon an issue as to the violation of plaintiff's certificate of public necessity for the operation of an auto stage line, the operator of taxicabs is shown to be guilty of contempt in violating a restraining order, where it appears that the taxicabs made repeated trips over the route in question, carrying passengers for hire, who were solicited on the streets until the vehicles were loaded, the only difference being that they did not operate on a regular schedule.

Appeal from a judgment of the superior court for Kittitas county, Nichoson, J., entered August 28, 1923, adjudging the defendants guilty of contempt for violation of an injunction. Affirmed.

*J. V. Hoeffler, E. Pruyn,* and *Harry L. Brown,* for appellants.

*R. E. Ostrander* and *E. E. Wager,* for respondent.

FULLERTON, J.—On March 23, 1922, the department of public works issued to the relator Savage a certificate of convenience and necessity, pursuant to § 6390 of the code (Rem. Comp. Stat.) [P. C. § 234-6], authorizing the relator to carry passengers and express

[1]Reported in 225 Pac. 656.

for hire between the city of Cle Elum and Lake Cle Elum and intermediate points, all in Kittitas county, one of which is the city of Roslyn. The bulk of the passenger traffic over the route originates in the cities of Cle Elum and Roslyn and is carried on between them; the places being some four and one-half miles apart and connected with a paved highway. The relator, on receiving the certificate, began the operation of auto stages over the route designated therein and has continued to do so to the present time. At the time the certificate was issued, the appellants, with others, were carrying passengers in automobiles for hire between Cle Elum and Roslyn, and continued so to do after the granting of the certificate. Thereupon the relator began actions against the operators to restrain them from so doing. After a trial upon the merits, the court entered the following judgment:

"It is by the court ordered and adjudged that the defendants, their agents, servants and employes be, and they are hereby permanently enjoined and restrained from carrying or transporting any passengers or express by motor vehicle for compensation between Cle Elum and Cle Elum Lake or intermediate points in competition with plaintiff, his successors or assigns, except as hereinafter provided.

"It is by the court further ordered and adjudged that said defendants, their agents, servants and employes be, and they are hereby permanently enjoined and restrained from in any manner soliciting for the defendant the transportation of passengers or express by motor vehicle for compensation over said route, or any part thereof, or from in any manner holding out to the public that defendant is operating a public stage or buss to transport passengers or express over said route, or any part thereof.

"It is by the court further ordered and adjudged that nothing herein contained shall be construed to or shall prohibit the defendant, his agents or employes from operating a bona fide taxicab business."

After the entry of the judgment, the defendants in the action continued the operation of their automobiles as taxicabs, carrying passengers as they did before. The relator thereupon instituted the present proceedings against them for a violation of the judgment entered in the prior action. After a hearing upon the merits of the action, the court adjudged them guilty of contempt and sentenced them severally to pay a fine. This is an appeal from the last mentioned judgment.

From the evidence adduced at the trial, it appeared that the appellants made frequent trips between Cle Elum and Roslyn, carrying passengers for hire, making a uniform charge of twenty-five cents per trip for each individual passenger; that they were accustomed to drive through the streets of the cities, even after they had one or more passengers, sounding the horns of their automobiles for the purpose of attracting the attention of other intending passengers, and would at times call out their place of destination for the same purpose. It was in evidence also that, when the traffic was moving in one direction, they would carry a load of passengers from the one place to the other and then go back empty for a second load; that they did not recognize the right of a passenger to ride singly in their vehicles, but would take on all others that signified an intention to ride, until the vehicles were loaded; and that none of them had taximeters on their cars, and only a part of them signs indicating that the vehicles were operated as taxicabs; certain of the witnesses testifying that the only observable difference between their method of operation and the method of operation of the licensed stage line lay in the fact that the appellants did not operate on a regular schedule or maintain fixed local stations between which they operated, as did the licensed line.

The statute regulating the transportation of persons and property on the public highways and authorizing the issuance of certificates of necessity to companies and individuals for that purpose, excepts from its operation companies or persons who "operate or manage taxicabs." Laws of 1921, p. 338; Rem. Comp. Stat., § 6386 [P. C. § 239]. The statute, however, offers no definition of the term "taxicab," but it is plain that it makes a distinction between such vehicles and vehicles operated in the business of transporting persons or property between fixed termini or over a regular route. From the association in which the word is used in the statute, it is inferable that the legislature relegated vehicles of that sort to that class of public conveyances which they have largely, if not entirely, superseded, commonly known as cabs, cabriolets, hacks, hackney coaches, and perhaps other names; vehicles that differed from the ordinary stage coach in that they did not operate on regular schedules over designated routes, or for a stated fare, but were vehicles kept at fixed stands for the purpose of hire to persons who desired their temporary use, or for the purpose of carrying persons on call between termini designated by the person calling them, at a rate of fare measured by the length of time of the use, or the distance the vehicle was compelled to travel in the performance of the service.

Between the vehicles named and the modern taxicab there are, of course, some very radical differences. To operate the first required no very high degree of technical skill, no license was required of the operator, and, being propelled by animal power, were more slow moving, and the area over which they were operated was bounded by a somewhat narrow compass. Taxicabs, on the other hand, are motor propelled, they re-

quire a skilled operator, and the driver of them must procure a license before he is permitted to drive them upon the public highways. They are also capable of moving with great rapidity, and can be used successfully over a wide area. The effect of these differences is that few, if any, taxicabs are kept to be let for hire without a driver, and in their operation they trench upon the territory occupied by the regular carriers, which the older vehicles did not.

But, we think, nevertheless, that the legislature intended to fix bounds in their operation beyond which they should not be permitted to pass; that it intended that they should be operated only after the manner of the earlier vehicles; that they should operate from fixed stands and should carry passengers. only on the call of such passengers. It is no doubt within their rights to carry passengers, when specially requested so to do, between any fixed places, whether or not the places be on a route over which another has a certificate of convenience and necessity, or whether or not it is necessary to travel over such route in the performance of the service, but that they are not permitted to hold themselves out as ready and willing to carry passengers generally between such places or over such routes; that they are not permitted, when they receive a call from a person, or group of persons, for carriage between designated places, to pick up others who do not specially solicit such carriage and carry them along with the persons specially employing them, and not even when so solicited without the consent of the persons first employing them.

The cases defining the rights and privileges of operators of taxicabs are not numerous. We have touched upon the general questions involved in *Davis & Banker v. Nickell*, 126 Wash. 421, 218 Pac. 243, and

*Davis v. Clevinger,* 127 Wash. 136, 219 Pac. 845. In
*Cook v. Lawwill,* 127 Wash. 92, 219 Pac. 864, it ap-
peared that the drivers of a taxicab company habit-
ually met incoming trains at a station in Aberdeen,
and, as the passengers alighted from the train,
would call out the destinations of the taxicabs, which
were at neighboring cities over the route to which the
complainant had a certificate of convenience and neces-
sity authorizing him to transport passengers. It was
contended that the acts of the drivers of the taxicabs
were within their privileges as taxicab operators, but
we held otherwise, using this language:

"On the arrival of the train and the approach of
prospective passengers, the drivers of respondent's
cars began to call out respectively 'This car goes to
Monte' (meaning Montesano), and 'This car goes to
Aberdeen,' each indicating his particular car. The
witness further testified that he stepped up to the car
which had been indicated as bound for Montesano,
asked the driver if he were going to Montesano, and
received the answer, 'Yes, get right in;' that others,
including the witness, entered until it was full to ca-
pacity; that he was not asked and did not hear the
driver consult any passenger as to the admission of
later comers. When full, the car departed for Monte-
sano, and on its arrival there, twenty-five cents as fare
was collected from each passenger. . . . We know
of no reason why a driver of a taxicab may not, at a
proper time and in a proper way, solicit a business
which properly belongs to it, but when a driver stands
at a railway station and greets disembarking passen-
gers with the cry 'this car for Aberdeen' or any other
particular destination, it indicates an attempt to carry
passengers between fixed termini, which may be done
for compensation only by an authorized certificate
holder. It also negatives the idea that the car is there
on call for a particular person or persons, and hence
casts grave doubt upon its being engaged in a taxicab
service. If the evidence shows only one occasion posi-

tively when this was done, that by no means indicates that there was but one such offense, for respondent's driver says only that he did not usually so call out, but adds that they always had, on the arrival of this Saturday night train, one car for Aberdeen and one for Montesano, which again negatives the idea of operating on call only, as well as clearly indicating that what was done on the particular occasion testified to was but one of a number of similar acts.

"We think that these, and other similar inconsistencies which we need not take the time to point out, indicate that, with or without respondent's knowledge, his cars were used on more than one occasion, and probably habitually, in violation of the transportation act, ch. 111, Laws of 1921, p. 338 [Rem. Comp. Stat., § 6387], and to the extent that they have been so used, he should have been enjoined under the rule laid down by this court in *Davis & Banker v. Nickell,* 126 Wash. 421, 218 Pac. 198."

In the case of *City of Memphis v. State ex rel. Ryals,* 133 Tenn. 83, 179 S. W. 631, Ann. Cas. 1917C 1056, the court defined a taxicab in the following language:

"The word 'taxicab' is one of recent coinage, to describe a motor-driven conveyance that performs a service similar to the cab or hackney carriage, held for hire at designated places at a fare proportioned to the length of the trips of the several passengers, who are taken to be carried to destinations without regard to any route adopted or uniformly conformed to by the operator."

In *Donnelly v. Philadelphia & R. R. Co.,* 53 Pa. Sup. Ct. 78, the word is defined thus:

"Taxicabs are now so generally in use that they are included in the class of common carriers. The name is a coined one to describe a conveyance similar to a hackney carriage operated by electric or steam power, and held for public hire at designated places, subject to municipal control."

In *People v. Milne,* 186 Misc. Rep. 417, 149 N. Y. Supp. 283, the court used the following language with reference to the privileges of operators of taxicabs:

"A taxicab, not a public hack, can doubtless lawfully be called for an ascertained patron or hirer to a given place, and may proceed to such place and stop there, although such place be a public hack stand, and remain there subject to the orders of such person so engaging it, provided that no unreasonable use be made by such taxicab of such public stand, and provided that such taxicab is not subject to hire by any person other than such ascertained person or hirer from the time that it is called until the time when it returns to the garage in which it is kept; and, for the purpose of securing customers, taxicab companies may, by agreement, keep representatives in hotels, public restaurants, and other places, but such representatives cannot be permitted to evade the ordinance in question by summoning taxicabs, not public hacks, from such garages to such places ostensibly for ascertained patrons or hirers, but in reality without such, but with a view to having them hired by any one from the public streets."

Tested by the foregoing principles, we think it clear that the appellants, by their acts hereinbefore described, not only exceeded their privileges as taxicab operators, but violated the decree of injunction theretofore entered against them. There was no error, therefore, in the judgment entered by the trial court, and it will stand affirmed.

MAIN, C. J., BRIDGES, and MITCHELL, JJ., concur.