No. 36,879

No. 36,880

No. 36,881

THE CITY OF FORT SCOTT, *Appellee*, v. CLAIRE ARBUCKLE, *Appellant*.

(187 P. 2d 348)

Opinion filed December 6, 1947.

*Hayden C. Covington*, of Brooklyn, N. Y., argued the cause, and *Harold M. Slater* and *Clinton J. Evans*, both of Topeka, were with him on the briefs for the appellant.

*Ernest E. Blincoe*, of Fort Scott, was on the briefs for the appellee.

The opinion of the court was delivered by

SMITH, J.: In each of these three cases the defendant was convicted in police court of disturbing the peace, in violation of a city ordinance. On appeal she was again found guilty on each charge. She has appealed. The cases were consolidated in the district court and have been consolidated on appeal.

Prior to submission in district court the city moved to dismiss each appeal on the ground the district court did not have jurisdiction to hear them because the defendant's recognizances were not filed within ten days of the conviction in police court. Upon the hearing of this motion it appeared that the recognizances were filed

in time but that when filed they were signed by the sureties only and not by the defendant.

The trial court thereupon permitted the defendant to sign the recognizances even though more than ten days had elapsed since the conviction in police court. When the defendant had done this the motion to dismiss was overruled. The city has appealed, on a question reserved, from the order of the district court refusing to dismiss these appeals.

Appeals from the police courts of cities of the first class are taken pursuant to G. S. 1935, 13-611. That section provides as follows:

"In all cases before the police court, an appeal may be taken by the defendant to the district court in and for the county in which said city is situated; but no appeal shall be allowed unless such defendant shall, within ten days after such conviction, enter into a recognizance, with sufficient security, to be approved by the court, conditioned for his appearance at the district court of the county at the next term thereof to answer the complaint against him."

Actions on forfeited recognizances given to perfect appeals from police courts are brought pursuant to G. S. 1935, 13-617. That section reads as follows:

"When any recognizance is declared forfeited, the city attorney shall forthwith cause the same to be prosecuted against the principal and security, or the surety alone."

The city points out those two statutes and argues that it was the clear intent of the legislature that in order to perfect the appeal the recognizance provided for in G. S. 1935, 13-617, must have been signed by the principal as well as the sureties, and since this was not done until more than ten days after the judgment in police court it was too late and the appeals should have been dismissed.

This is too strained and strict a construction of these two statutes. Under the provisions of G. S. 1935, 13-617, the action on a forfeited recognizance may be brought against the principal and surety or the surety alone. This must be the law. This is the clear intent of the statute. Had the defendant here not appeared in district court when her cases were called the appeal bonds would have been forfeited and action begun to collect on them. The fact that they had not been signed by the defendant would have been no defense to an action on them. (See *Tillson v. State*, 29 Kan. 452.) At any rate, any deficiency in these recognizances was cured when the trial court in the exercise of its discretion permitted the defend-

ant to sign them even though more than ten days after the judgment had elapsed.

The action of the trial court in overruling the motion of the city to dismiss the appeals to the district court was correct.

Each one of the offenses was charged to have taken place at a different rooming house in the same city.

At the close of the city's evidence in district court defendant demurred to it and also filed a motion to dismiss the action and discharge her on the ground that the evidence showed her not to be guilty and that the ordinance as the city construed and applied it to the facts and circumstances was unconstitutional. These motions were overruled. After presentation of her evidence and final submission defendant was found guilty on all three charges. She was sentenced to pay a fine on two of the charges and to confinement in the city jail for thirty days on the other. Hence this appeal.

Defendant argues first, that the undisputed evidence shows affirmatively she is not guilty on any of the charges; second, that when given a reasonable interpretation the ordinance relates only to disturbances in a public place and does not apply to buildings, such as the rooming houses in question; and third, that under all the facts and circumstances her conviction of a violation of the ordinance deprived her of the constitutional freedom of speech, press and worship, contrary to the state and federal constitutions. This argument will require an examination of the evidence in each case. This will be set out now before dealing with any legal questions.

Defendant points out the following undisputed facts common to each case. She was twenty years old. She was an ordained minister of Jehovah's Witnesses engaged in a house-to-house missionary work. Her method of preaching was to call from door to door and offer people literature explaining the Jehovah's Witnesses theory of the Bible. The complaining witnesses ordered her not to call from door to door in the buildings under their control. She refused to comply with such commands, claiming that she had the right to call from door to door because the residents of such places had the right each to determine for himself when called upon, and that the complainants, as managers, did not have the right to speak for the residents by issuing a blanket order to appellant not to carry on such door-to-door activity.

As to case No. 36,879, there was testimony that the complaining witness operated a rooming house; that defendant had been at this

rooming house during the summer before her arrest on various occasions and the witness had asked her to stay away; that on October 31, 1945, defendant came to the rooming house about four o'clock in the evening, entered it and knocked on the door of a room where a young lady was sleeping; that when witness came out in the hall she saw defendant going into the room of a man roomer and in a minute witness heard a Victrola. It should be stated here that apparently defendant used a Victrola in her ministry when she called on people in their homes. It seems this machine was used to play a record and thereby convey a message of some sort. Witness took defendant by the arm and pulled her out of the room and told her if she did not leave she would call the police; that witness went to call the police and while she was gone defendant went to the room of the young lady who was asleep. The witness further testified that she did not, in the operation of her rooming house, permit women to go into men's rooms or men into women's rooms because "I found out you can't let them do it, because they will go in and go to bed together, so I got onto it and made my veto that I allowed none of them to"; that the man roomer complained to her about the defendant bothering him.

As to case No. 36,880, one witness, the assistant manager of the rooming house, testified, in part, as follows:

"I am the assistant manager of the Conyers Hotel. Our trade is practically all people from the Main Street Hospital next door to us, and relatives who take care of their sick people and, of course, we have some who are ill and are waiting for treatment and want rest until they are ready for them at the hospital. People sleep there day and night. We also have a great many operative patients from Doctor Hunter downstairs and they have to be kept perfectly quiet. The people who stay there come in relays. Some take care of their sick people next door all night and sleep through the day and the rooms are occupied both day and night. We have had some transients, of course, but most of our people are hospital people."

Witness further testified that defendant on one occasion came to her rooming house and witness told her some of the roomers were in and asked her not to knock and she went ahead and knocked on every door. She then testified, in part, as follows:

"The next time I saw her was on December 9, 1946. She came just before noon. I was in the front and Mrs. Price was just getting ready to go to her place of business. When I saw her, I went and called Mrs. Price. Mrs. Price asked her to leave very nicely and she wouldn't leave and she knocked on every door in the house and left literature under the door when they didn't respond. We had a very sick man in one room and while they were trying to

get him up to get him to the hospital this girl went to the door and beat on it, and put her foot part way in the door. The man's wife came to the door and told her she knew about her literature and finally had to slam the door in her face. When she started back to our private living quarters, I followed. Mrs. Price told her she dare not go to our living quarters. She then started to my room. Mrs. Price got her away from there and then she finished up on all the rooms, with us telling her she had to leave and Mrs. Price told her she was going to call the law, which she did."

Witness testified that this was the occasion upon which defendant was arrested.

As to case No. 36,881, the prosecuting witness testified that she ran a rooming house which catered in part to railroad employees, some of whom worked in the nighttime and had to sleep in the daytime; that her house had nine rooms; that she saw defendant along the first of September, 1946, rapping on the doors in her rooming house; that defendant told her she had some literature and wanted to give her some; that she said to defendant—"Listen, . . . you leave those doors alone. There is three men in each room sleeping"; that defendant said "You don't know they might want to be wakened and hear what I have to say"; that she went to the next door and one of the men got up and came to the door and she started reading to him and he said he didn't want to hear it; that about a week later she returned; that one old gentleman who roomed there wouldn't listen, and all her roomers told witness they didn't want to be bothered with her; that defendant kept on coming back and finally on June 9, 1947, she had defendant arrested; that one of her roomers said "You are the landlady, why don't you keep her out?" On the day she had defendant arrested defendant was around about five p. m.; that she saw defendant pounding on the first door and told her a man was in there asleep and did not want to be disturbed; that he was just getting up and told her to come in and then defendant said "Well, this is someone you don't know"; that the man opened the door and she commenced reading to him; that he told her he did not care about it.

The evidence in all three cases was corroborated generally by testimony of arresting officers. The cases were finally submitted to the district court without a jury. The court made findings of fact and conclusions of law, as follows:

### "FINDINGS OF FACT

"1. The appellant has appealed from three separate charges of disturbing the peace, having been convicted thereof under Ordinance 342, Chapter 35 of

the Ordinances of the City of Fort Scott, the pertinent part of which reads, 'that any person who shall wilfully disquiet or disturb the peace, order or quiet of the City of Fort Scott or of any person, family or neighborhood in said city by rude or indecent behavior, profane discourse, disorderly conduct, noisy and boisterous talking or discourse shall be guilty of a misdemeanor.'

"2. Appellant is a young woman of the age of twenty years and is a minister of Jehovah's Witnesses. She has resided and pursued her work in Fort Scott for approximately one year.

"3. Mary Ratliff rents a second floor living room at 20½ North Main Street in the City of Fort Scott. She is a widow, past 60 years of age, a seamstress and in her living quarters had additional rooms, about nine in number, which she rents as sleeping rooms by the day and by the week. She has lived at this address and so operated since 1934. On several occasions prior to October 31, 1945, the appellant had come up the stairs and entered the corridor of the living quarters of Mrs. Ratliff and knocked on doors and left literature and attempted to play her portable phonograph. Mrs. Ratliff had told her she didn't want her up there, that the roomers didn't want her there and that she should not return to her quarters.

"4. On October 31, 1945, the appellant went up the steps into the quarters of Mrs. Ratliff and was discovered going into the room of a man at the extreme end of the hall. Soon the phonograph began playing. Mrs. Ratliff had a rule that women were not permitted in the rooms of men and men were not permitted in the rooms of the women quartered in her apartment. Mrs. Ratliff took hold of the arm of the appellant, pulled her out of the room and attempted to shove her down the hall. Appellant refused to go. Mrs. Ratliff became highly irritated and nervous and going to the telephone called the police. When she returned the appellant had again entered the man's room and started playing the phonograph. At the point the man told appellant he did not want to hear the phonograph and she then left his room. She stood about the hall until the arrival of police officers, who had conversation with the appellant and Mrs. Ratliff and others and the police officers asked her to leave. She refused to go unless she were placed under arrest. The officer placed her under arrest and led her from the hallway. The obtrusion of the appellant into the apartment of Mrs. Ratliff against her will and after warning, her playing the instrument and refusing to leave greatly disturbed and irritated Mrs. Ratliff, she became highly nervous, was unable to sleep and suffered great nervous disturbance.

"5. Sadie Price leases and operates a second story apartment at 205½ South Main Street in the City of Fort Scott. This is named Conyers Hotel. It is adjacent to the Main Street Mercy Hospital. Her assistant and manager is Lillian Harry. Both are unmarried women of middle age. They have living quarters at the rear of the hallway and have about eleven more rooms which they rent by day or by week, largely to people who have relatives in the adjacent hospital and who are there taking care of the sick. They also have convalescents from a doctor's office on the first floor. People sleep during all hours of the day in these rooms and more than ordinary quiet is maintained. There is no regular hour for making up rooms on that account.

"6. Several times prior to December 9, the appellant had entered this

stairway and into the apartment and knocked on the doors and called residents out of bed and passing the literature and making her talk. She had on several occasions been told the nature of the apartment, that quiet was desired, that persons were sleeping at all hours, that they cared for the sick and were resting and that there were sick in the rooms and that she should not disturb them, that she could leave material for anyone at the desk and it would be given to them. She was directly informed not to come into the apartment.

"7. On December 9, 1946, shortly before noon, she came to the apartment without knocking and without permission and began going from room to room. Lillian Harry remonstrated with her, told her there were sick people in the rooms and that she should not knock and disturb them. Notwithstanding this warning and admonition, appellant went to the door numbered 1 and knocked loudly. A woman, who was in the room with a sick husband, came to the door. There was some talk and the door was shut. She went from that door systematically from one door to the next with Mrs. Harry asking her to leave and desist, knocking on each and every door and putting material under the doors. She walked to the back of the hall and walked into the open door of the apartment of Sadie Price. Sadie Price pulled her out. She then walked into the open door of the room of Lillian Harry. The police were called but before the arrival of the police appellant had left the apartment. Again, at a later hour in the afternoon of the same day, appellant again appeared up the hallway. She was admonished by Mrs. Price and Mrs. Harry to leave. She refused and systematically again went from door to door knocking loudly on the doors two or three times even though informed that there was no one in the rooms and continued her leisurely course, going from door to door, knocking and putting literature under the doors. The police were called and the arrest made after appellant had left the apartment.

"8. Mrs. Elva Joyce, a widow of middle years, leases and occupies an apartment at 101½ North Market Street in the City of Fort Scott. She has about nine rooms, in addition to the one she occupies, which she rents as sleeping rooms to transients. There are people sleeping in these rooms at all times of the day. Several times prior to January 9, 1947, appellant had appeared in her hallway, knocking on the doors, attempting to play her phonograph and disturbing those asleep and distributing literature. Roomers remonstrated to Mrs. Joyce that they did not want her there, that she disturbed them and asked Mrs. Joyce to keep her out. Mrs. Joyce on several occasions ordered her out and told her not to return.

"9. On January 9, 1947, she made three calls to this apartment. The first was about 4:30 in the afternoon. She came up the stairs, commenced going from door to door knocking and placing literature under the doors. Mrs. Joyce asked her to leave. She refused to go. Mrs. Joyce tried to push her out but she was unable to do so. After she had knocked on all the doors and found some of the occupants gone and some who refused to answer, she left. She was again warned not to return, that they did not want her up there and that she disturbed them. About an hour later she reappeared. Mrs. Joyce saw her coming and met her at the door entering from the stairway

into the hallway. Mrs. Joyce held the door. Appellant pushed and shoved and attempted to enter but was unable to do so and went back down the stairs. A few minutes later she again returned. Mrs. Joyce saw her coming, met her at the hallway door but appellant hastening through and being of sturdy build was able to push her way into the door and past Mrs. Joyce. She began knocking on the doors and Mrs. Joyce began ordering her out and attempted to shove her out. She refused to go. One old gentleman asked if he should hit her over the head with a cane. There was considerable commotion. All those present in the hall said they did not want her there. There was ensuing disturbance. Mrs. Joyce was highly irritated, became nervous and disturbed. The police were called and arrived and considerable talk was had in the presence of all. Appellant refused to leave until she was placed under arrest and so was arrested and taken to jail.

"10. On at least two occasions since the occasion of October 31, appellant has gone into the apartment of Mrs. Mary Ratliff at 20½ North Main, again attempting to make her way to the doors of the roomers and on both occasions she has been struck over the head with bottles and forced out of the hallway.

"11. The police have had numerous calls and complaints of a similar nature against the appellant which have not resulted in arrests.

"Conclusions of Law

"1. Appellant is guilty of the offense charged on October 31, 1946, having disturbed the peace of Mary Ratliff and is assessed a fine of $25.00 and costs.

"2. Appellant is guilty of the offense charged on December 9, 1946. She disturbed the peace of Sadie Price and Lillian Harry and of the City of Fort Scott in the vicinity of 205½ South Main Street and is assessed a fine of $35.00 and costs.

"3. Appellant is guilty under the charge of January 9, 1947, having disturbed the peace of Elva Joyce and the City of Fort Scott in the vicinity of 101½ Market Street in the City of Fort Scott, and is assessed a penalty of thirty (30) days in the City Jail of Fort Scott, Kansas, and costs.

"Defendant is remanded to the custody of the Chief of Police of the City of Fort Scott for the execution of the sentence."

Judgment was entered in accordance with the conclusions of law. Motion for a new trial was overruled. Hence this appeal.

Defendant insists here that the evidence shows only her entry into the buildings in question and an orderly rapping on the doors of roomers for the purpose of presenting to the occupants information concerning God's kingdom and such did not constitute a disturbance of the peace, as a matter of law. Defendant argues on this point that in the absence of a covenant to the contrary the roomers in a rooming house have a right to receive and entertain invitees and guests in their rooms for all proper and lawful purposes and this right includes the privilege of receiving a minister of the gospel who calls for the sole purpose of helping them to under-

stand and appreciate God's Word. She argues that this right cannot be revoked by the operators of the rooming house. She argues further that she was in effect an invitee of the roomers and as such had a right to the use of the hallways, stairs and entrances of the rooming house for the purpose of calling upon the roomers therein. The city argues that there was substantial evidence from which the trial court was warranted in finding that the conduct of defendant far exceeded orderly knocking on doors.

We shall first consider the argument of defendant that when the ordinance is properly construed and applied none of the acts specified as unlawful were shown to have been committed by her. She presents this argument under two headings.

The first one is that her conduct, which she insists was nothing more than an entry into the buildings in question and an orderly rapping on doors for the purpose of presenting to the occupants information concerning God's kingdom did not constitute a disturbance of the peace, as a matter of law.

The ordinance with a violation of which she is charged is ordinance No. 342 of chapter 35 of the city of Fort Scott. It provides as follows:

"Section 1. That any person who shall wilfully disquiet or disturb the peace, or quiet, of the City of Fort Scott, Kansas, or of any person, family or neighborhood in said city, by rude or indecent behavior, profane discourse, disorderly conduct, noisy and boisterous talking, or drunkenness, shall be deemed guilty of a misdemeanor."

The argument of defendant is that the evidence of the city did not show her behavior to be either rude or indecent; that it was not shown that her discourse was profane or her conduct disorderly; that it was not shown that she did any noisy or boisterious talking or that she was drunk. As a matter of fact, she argues that the city's evidence really proved that she did none of the acts specified in the ordinance and that her conduct and behavior were never such as are forbidden by the ordinance. She argues further that she did not disturb the peace or quiet of any person, family or neighborhood.

It is true her conduct was never indecent, her discourse was never profane nor was she ever drunk. On the question of whether her behavior was rude or her conduct disorderly, or her talking noisy and boisterious, we must examine the record. In this court she says all she did was "an orderly rapping" and all she said was that she wanted to discuss God's kingdom with the occupants of the rooms.

We shall treat first some of the authorities upon which she relies. In *State v. Korich,* 219 Minn. 268, 17 N. W. 2d 497, an ordained minister of Jehovah's Witnesses was knocking at the door of an apartment in a building containing twenty apartments. He stated he was looking for a man with whom he had been in contact before. About a month before he had been in the building and the caretaker had told him to stop disturbing the tenants and to stay off the premises. On the day of the arrest as he was knocking at the door of an apartment the caretaker grabbed him by the shoulders and said "Didn't I tell you to . . . get out and stay out." The caretaker requested the police to arrest the defendant because he was soliciting. The court said the test in a prosecution for disturbing the peace was whether the conduct was of such a nature as to affect the peace and quiet of persons who might witness it and who might be disturbed or provoked to resentment by it. In a consideration of the record the court pointed out the calm and courteous manner of the defendant; that he did not raise his voice and that none of the tenants appeared in court to say they were disturbed. The court said there was nothing in the evidence to show that the reasonable tendency of defendant's actions was to arouse anger to the extent that a disturbance of the peace would result.

*State of Maine v. Wagner,* 141 Me. 403, 44 A. 2d 821, was a case where a pastor of Jehovah's Witnesses came to a rooming house to see a person with whom he had talked on various occasions. While there he asked for another roomer and the caretaker refused to tell him which room that person occupied. During the course of these visits the defendant did engage in Bible study with the roomer he had first come to see. Finally on the occasion of the defendant's arrest he had again asked to be shown the room of the other roomer. The court pointed out that there was no evidence of any conduct that had been displeasing to the caretaker other than his persistence in asking about the roomer whose room the caretaker had declined to disclose. The supreme court reversed the conviction.

In *Commonwealth v. Richardson,* 313 Mass. 632, 48 N. E. 67, the statute made it a misdemeanor for a person to remain on or enter upon premises after being forbidden to do so by the person in lawful control of the premises. The caretaker of an apartment building containing about twenty-five apartments found two of Jehovah's Witnesses, ordained to preach, in the vestibule of the building. There was located in the apartment a series of bells, one for each apart-

ment. They were ringing bells for different apartments when the caretaker found them and ordered them to leave. They refused to leave saying they were ministers and had important work. They rang several bells and finally one lady opened the door and listened to a record played out in the corridor. An officer had been called and on arrival told the defendants they must leave or he would arrest them. They refused to leave and were arrested. They were found guilty of violating the statute by coming on the premises after having been forbidden to do so, and appealed. The supreme court of Massachusetts pointed out that the defendants were already in the vestibule when the caretaker found them. The court also pointed out that in furnishing the series of bells that could be rung in the vestibule an implied license was granted to the denfendants and all others engaged in lawful pursuits to make use of them to seek an interview with the tenants. Having reached that conclusion, the court had only to reach a conclusion that preaching the gospel was a lawful business to reverse the conviction of the defendants. Even then the court was careful to point out that the result might have been different had the defendants been charged with remaining on the premises rather than coming on them.

The defendant in the case at bar derives the theory of her defense from what the court said in the Richardson case, as follows:

"In the instant case the defendants were lawfully in the vestibule, where the means for communicating with the respective tenants had been installed that the tenants might at will release the lock and give access to those seeking to see them. Of course they could decline to do so if they saw fit. The releasing of the lock we think must be held to have at least conferred upon the defendants a license or permission to enter the inner halls, to approach the apartments in question, and, if permitted by the tenant, to state the object of their call. This was a license for the tenants to grant or withhold, one embraced within the easement conferred upon them by the letting, one which subsisted until revoked by the tenants, and one which the tenants could exercise notwithstanding objections of the landlord, who could not revoke the license any more than he could an invitation extended by the tenant to one calling upon any legitimate business. *Freeman v. Wright*, 113 Ill. App. 159, 161. *State v. Lawson*, 101 N. C. 717. The response to the bells in the case at bar and the releasing of the lock of the inner vestibule door constituted a license or permission to the defendants to enter, to identify themselves, and to disclose the purpose of their visit. In so entering we think that it could not be found rightly that they had entered after having been forbidden 'so to do' in violation of the statute." (p. 640.)

In *Cantwell v. Connecticut*, 310 U. S. 296, 84 L. Ed. 1213, 60 S. Ct. 900, Cantwell and some companions, all Jehovah's Witnesses who

were ministers, were found guilty of a violation of a statute forbidding solicitation without a license. The United States Supreme Court reversed the conviction on this charge because it held the statute to be unconstitutional. Cantwell was also found guilty of the common-law offense of inciting others to a breach of the peace. The facts the state court held to support the conviction of Cantwell of the crime of inciting to a breach of the peace may be stated in the words of the Supreme Court, as follows:

"The facts which were held to support the conviction of Jesse Cantwell on the fifth count were that he stopped two men in the street, asked, and received, permission to play a phonograph record, and played the record 'Enemies,' which attacked the religion and church of the two men, who were Catholics. Both were incensed by the contents of the record and were tempted to strike Cantwell unless he went away. On being told to be on his way he left their presence. There was no evidence that he was personally offensive or entered into any argument with those he interviewed." (p. 302.)

The court pointed out that the state had an obvious interest in the preservation of peace and good order within its borders. The court then pointed out that in regulating the conduct of its citizens so as to minimize the danger of riots and violence, the state must not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions. The court then pointed out that Cantwell was on a public street where he had a right to be and he had a right to impart his views to others; that there was no showing that his conduct was noisy, truculent, overbearing or offensive. The final statement of the court was:

"We find in the instant case no assault or threatening of bodily harm, no truculent bearing, no intentional discourtesy, no personal abuse. On the contrary, we find only an effort to persuade a willing listener to buy a book or to contribute money in the interest of what Cantwell, however misguided others may think him, conceived to be true religion." (p. 310.)

*Lynch v. City of Muskogee*, 47 F. Supp. 589, was an action to enjoin the enforcement of an ordinance, one section of which made it unlawful to distribute profane, violent or abusive language calculated to cause a breach of the peace. For some months before the passage of this ordinance every Saturday afternoon there had been a number of fights on the streets of Muskogee caused by members of Jehovah's Witnesses coming to town and handing out their literature. After its passage at different times several members of the Witnesses had been arrested in police court and fined for violation of that ordinance. The federal court enjoined the enforcement

of the ordinance not because the ordinance was void but because the effect of its enforcement was to prohibit the members from peaceably disseminating or offering for sale their literature. The record did not disclose there had been any fights caused by the ordinance being violated after the enactment.

*Miller v. State,* 75 Okla. Cr. 428, 133 P. 2d 233, was a case where Miller had been convicted for a breach of the peace. The information under which he was convicted charged that he committed this breach of the peace by stating that he did not believe in man-made laws and that the only laws he would obey were the laws of Jehovah; that he would not salute the flag, and other similar statements. The statute under which he was prosecuted made it unlawful to use profane, violent, abusive or insulting language toward another person, in the presence or hearing, which language, in its common acceptation, was calculated to arouse to anger the person about or to whom it was spoken or addressed, or to cause a breach of the peace. The court instructed the jury on a statute which made it a misdemeanor to commit any act which injured any person or grossly disturbed the public peace. The evidence showed that the defendant was a member of Jehovah's Witnesses; that he came to town with a placard on his car with quotations from the Bible and worked on the streets giving out literature; that a crowd collected about the car and questions and answers were had. There were no fights and no acts of violence; that he did make statements that he did not believe in man-made laws and he did not reverence the American flag. The Supreme Court of Oklahoma quoted from the case of *Cantwell v. Connecticut,* supra, and held that the conduct of the defendant and the words he used were not such as to constitute a breach of the peace.

*State v. Sanford,* 203 La. 961, 14 So. 2d 778, was a case where the Jehovah's Witnesses came to town and handed out some of their literature. They were charged with disturbing the peace under the statute somewhat similar to those already quoted. The court quoted from the Cantwell case, *supra,* and held that the conduct of these defendants was not such as to constitute disturbance of the peace.

In *People v. Kieran,* 26 N. Y. S. 2d 291, the defendants were charged with disturbing the peace. The evidence showed that they were proceeding along the walk in a city; that they were Jehovah Witnesses; they were carrying some banners upon which were the

words "Religion is a snare and a racket" and similar statements. The court discussed a number of decisions and held that the conduct was not such as to constitute a violation of the ordinance. Here there were no fights and no real disturbance.

In *People v. Reid,* 180 Misc. 289, 40 N. Y. S. 2d 793, the offense was disturbing the peace and the evidence was that the defendant played a phonograph record such as has been spoken of heretofore in a hall of an apartment house but no fights and no riots occurred. The court held that the evidence did not show a breach of the peace.

Defendant cites and relies on one Kansas authority dealing generally with a disturbance-of-the-peace charge, that is, *State v. Woodbury,* 49 Kan. 541, 31 Pac. 148. In that case this court held that the charge of disturbing the peace grew out of a dispute between some farmers over the right to the landlord's share of a crop of wheat. This court in reversing the conviction pointed out there was no evidence of any disturbance of the peace of any one on the part of the defendant and that the prosecution was obviously an attempt on the part of the complaining witness to use the criminal processes to obtain possession of disputed property. This court remarked it could not condone such a practice. The opinion is not in point here, except as it illustrates the rule that in the trial of a disturbance-of-the-peace charge the relationship of the parties, the situation of the persons claiming to be disturbed, and all the surrounding facts and circumstances, must be considered.

With the exception of the Woodbury case just discussed these are cases where the disturbance claimed was charged by the state or city to have arisen on account of the conduct or the words uttered by the defendants in connection with their evangelism. To state it more clearly, the cases upon which defendant depends are cases where the state or city charged the disturbance arose because Jehovah's Witnesses made statements against organized religion or the flag or man-made laws or something of that sort.

This case was tried on a different theory than that. We do not find it necessary to decide whether it would have been a breach of the peace had this defendant spoken on the street or even in the hall of a rooming house or apartment house and stated to people she was a member of Jehovah's Witnesses and that she would like to induce the person to whom she talked to be a member of Jehovah's Witnesses and that she did not believe in organized religion or similar language, and nothing more. On the other hand, the appeal

may be decided on an examination of the defendant's conduct entirely apart from her religious views or activities.

In this connection we are fortified somewhat by a concession of counsel for the defendant in their brief. They say:

"Appellant does not make the absurd contention that she has a constitutional right to disturb the peace, merely because she is engaged in preaching the gospel. The proposition asserted by the appellant is that merely because some individuals take offense at the Kingdom message proclaimed by Jehovah's Witnesses—or their manner of proclaiming it—constitutes no ground for convicting them for disturbing the peace."

No one contends that defendant should be convicted of disturbing the peace merely because some individuals took offense at the "Kingdom message" proclaimed by her. In the first place, we do not find in the evidence of the city any reference to Jehovah's Witnesses or to the Bible or religion of any sort. In the first rooming house, to which defendant went, she rapped on the door of the room where a young lady was sleeping after being told the occupant of the room was asleep. It was about four o'clock in the evening. Perhaps the young lady should have been up. Perhaps on the other hand she worked at night and slept in the daytime. At any rate, she had a right to sleep in the afternoon if she wanted to. She had a right to request her landlady to keep people from waking her, and the landlady had a right to grant this request. The landlady saw defendant entering the room of a man; when she remonstrated with her about being in this room she left it for a minute, then went back into it. She testified she did not allow men to enter women's rooms or women to enter men's rooms. This was a perfectly reasonable rule and one which she had a right to make and enforce. After the defendant had been advised of this rule she still persisted in being in and remaining in the room with the man guest. One guest in this rooming house said "My Lord, she was up here four or five days." On one occasion when the defendant was knocking on rooms that were darkened the complaining witness hit her over the head with a bottle. On this occasion the defendant talked to an Italian man. The record does not disclose whether she went into this man's room or not. This conduct is much more serious than the mere gentle rapping at the door of a roomer, which counsel and defendant both say was all she did. What constitutes a disturbance of the peace and quiet of a neighborhood or what constitutes rude behavior or disorderly conduct or boisterous talking so as to constitute a dis-

turbance of the peace depends on the person uttering the language, the person to whom uttered and all the surrounding facts and circumstances. All these elements are proper issues for the trier of facts. (See 11 C. J. S. 825 and *City of Topeka v. Heitman,* 47 Kan. 739, 28 Pac. 1096.) The conduct need not be such as to incite others to riot or violence. (See 8 Am. Jur. 835; *State v. Hebert,* 121 Kan. 329, 246 Pac. 507; *State v. Burns,* 35 Kan. 387, 11 Pac. 161; and *State v. Duvall,* 140 Kan. 456, 36 P. 2d 958.)

The second rooming house where defendant was alleged to have disturbed the peace was next door to a hospital and catered to people who had relatives in the hospital. Sometimes they were there to take care of their relatives who were patients and sometimes they were in the rooming house waiting to go to the hospital and sometimes the roomers stayed with their friends, who were in the hospital in the nighttime and slept in the daytime. Defendant had been in this rooming house several times and had been requested not to return but when she came here on the occasion of her arrest just about noon the landlady requested her to leave, but she knocked on every door in the house. In one room there was a very sick man they were getting ready to take to the hospital. She knocked on the door and his wife opened it and then defendant put her foot in the door so she could not close it. Finally the woman whose husband was sick did slam the door in defendant's face. That day she left the rooming house before the police came but that evening she came back and started toward the sick man's door again. Just then the police came before she left and she was arrested. The landlady did not want people knocking on the doors of the rooms because people were apt to be sleeping there at all hours of the day. This was a reasonable regulation. The people who came there under the circumstances had a right to expect not to be disturbed and the landlady had a right to do her best not to have them disturbed. A worse disturbance than being awakened from a daytime nap when the person asleep had been working at night can hardly be imagined. The same may be said of the insistence of defendant on talking to one who was taking care of a sick relative.

The next rooming house in which defendant is alleged to have disturbed the peace caters to railroad employees. Some of these men worked in the night and had to sleep in the daytime. The defendant was told on one occasion that there were three men sleeping in a room who did not want to be awakened. The defendant said they

might want to be awakened and hear what she had to say. She insisted on knocking at this door and the landlady told her a man was asleep in there but he awakened and came to the door while she was knocking on it. This man told her he did not care to hear about her talk.

On one occasion with reference to these rooming houses the defendant herself said "I returned again and entered. I went up the stairs and got inside and then she started to push me out but I turned around and got inside the hall. I did not use much force to get into the hallway, but enough to get away from the hold she had on me. She had hold of my arms. I then started to knock on doors where no one had previously responded that day."

The railroad men had a right to sleep in the daytime. They had a right to request the landlady to keep people from knocking on doors when they were asleep. The landlady had a right to grant this request and to attempt to enforce it. This is entirely aside from and notwithstanding the errand or business of defendant.

In each of these cases the defendant had been a caller at the rooming house in operation on previous occasions. She had rapped on doors of roomers and had been requested not to return and so conduct herself. She must have known the general nature of each of these houses, and that they were likely to resent being disturbed. Her entire course of conduct shows a determination on her part to commit these disturbing acts whether the keepers of the rooming house and the roomers were willing for her to do so or not. Had she stopped these people on the street or in a park or nearly any place where she had a right to be and talked to them about her religious message we would have the question of her right to preach her religion even though the statements she made in doing so were irritating to some of her listeners. We need not decide that here, however.

The point is, one must have some place to which he may retire and be reasonably free from annoyance or disturbance. Occasionally any one of us wants quiet and rest. Some are fortunate enough to have a home to which they may go when the day's or night's work is done. Some are not so fortunate. When time comes to let sleep knit up "the ravell'd sleave of care" the only refuge such have is a rooming house. One such has one advantage, however, he can request his landlady not to let him be disturbed while he sleeps. Such a request is a reasonable one, whether it comes from the presi-

dent of the United States in the White House or from a brakeman on the Frisco at Fort Scott. One of the boons which man receives from living under an orderly government is to be able at times to lie down and sleep without fear of being disturbed. Of course when the dweller in a house has a walk from the street to his front door and a doorbell or knocker there, such is an invitation to a passerby bent on lawful business to approach, make his presence known and to state his business. A gentle rapping and an orderly statement that the caller wished to discuss religion with the occupants would scarcely be disturbing the peace.

We do not have such a case here. Some of the roomers had asked the landlady not to permit them to be disturbed. The landladies had each asked the defendant not to disturb them. This was their only means of securing that tranquillity so necessary to real rest.

This record is devoid of any evidence whatever that any roomer at any of these houses ever invited defendant to come to any of these rooming houses for any purpose. In fact, it is all to the contrary.

We reiterate we are not holding that the discussion of her religious views on the part of defendant constituted a violation of this ordinance. We merely hold that her conduct at these rooming houses, entirely aside from anything she may have said about religion, was such as to constitute a violation of this ordinance.

Having reached the above conclusion for the reasons stated, it is not necessary for us to discuss the other two grounds urged by defendant. A violation of the ordinance may occur at other than a public place, neither is the question of religious liberty in the case.

One more question remains; defendant in district court was tried by the court without a jury. She did not object to this at the time. It was not one of the errors urged on her motion for a new trial. It was not one of her specifications of error. She raises it here for the first time and argues that to try her without a jury was to deprive her of her rights under the constitution.

It is questionable whether this question should be considered by us now since it is raised at such a late stage. It is not necessary to place the decision on that ground, however. Defendant went to trial before the court without a jury without objection. It is questionable whether defendant had a right to a jury trial even on appeal from the police court. At any rate, in such cases, a jury trial may be waived. (See In re Mote, 98 Kan. 804, 160 Pac. 223; also State

*v. Wells,* 69 Kan. 792, 77 Pac. 547; and *State v. Stratton,* 103 Kan. 226, 173 Pac. 300.)

The conduct of the defendant in going to trial before the court without a jury was a waiver of her right to have a jury.

The judgment of the trial court is affirmed.