**FISCHBACH, Appellant, v. OHIO STATE RACING COMMISSION, Appellee.**

Ohio Appeals, Ninth District, Summit County.

No. 4560.  Decided November 30, 1955.

Hershey, Hatch, Browne, Wilson & Cook, for appellant.

C. William O'Neill, Atty. Genl., William A. Carroll, Atty Genl., for appellee.

## OPINION

By HUNSICKER, J.

This is an appeal on questions of law from a judgment of the Common Pleas Court of Summit County, Ohio, affirming an order of the Ohio State Racing Commission.

C. B. Fischbach, the appellant, an owner, breeder and licensee of racing horses, was on July 10, 1954, fined $200; and the order further said "the entries of any of his horses will not be accepted for the remainder of the Thistledown meeting." This action was taken by the stewards of the Thistledown race track.

A hearing was thereafter held by the Ohio State Racing Commission, wherein the citation and notice of hearing set out that Mr. Fischbach "was fined $200 and the entries of any of his horses will not be accepted for the remainder of the Thistledown meeting. This action was taken because Mr. Fischbach created a disturbance, and questioned the accuracy of the photo finish camera; third race, Thursday, July 8, 1954."

The racing rules which Mr. Fischbach was accused of violating read as follows:

Rule 54:

"If any licensed person uses improper language to the racing officials or threatens such officials, or if any person uses profane or indecedent language, carries or exhibits a deadly weapon, or otherwise disturbs the peace of any race track enclosure, he may be ejected, fined, suspended or ruled off."

Rule 84:

"The Stewards shall have the power to fine not in excess of two hundred and fifty ($250.00) dollars, suspend, rule off or expel at their discretion any person for disorderly conduct or breach of the peace, or for violations of the Rules of Racing or any regulations they may establish not inconsistent with the Rules of Racing. Any such regulations adopted by the Stewards shall be reported promptly in writing to the Commission, and shall remain in effect unless and until the Commission shall otherwise order."

A cursory examination of these rules discloses no authority for assessing a fine or imposing a restriction upon entry of horses because a licensee or other person questions the accuracy of the photo finish camera. We are consequently relegated to an examination of this record to determine whether there is any evidence that Mr. Fischbach created a disturbance within the meaning of the rules above set out.

There was nothing in the rules which said that creating a disturbance was an offense punishable by fine and suspension, but the rule 54 did say that one who "otherwise disturbs the peace of any race track enclosure" could be fined; and rule 84 said that one could be fined "for disorderly conduct or breach of the peace." Although there is only a

slight similarity between the charge as made by the racing officials and the rules under which they were required to operate, and the judgment could be reversed for the reason that there was no authority in law for conviction based upon a charge that was not an offense within the rules, yet we will discuss the charge of "creating a disturbance" as though it were meant to be (1) "or otherwise disturbs the peace of any race track enclosure" under rule 54, and (2) "disorderly conduct" under rule 84.

Mr. Fischbach, from the place where he was sitting near the finish line, thought his horse had won the third race. A photograph of the finish was several minutes being posted, and others, including a track usher, believing the Fischbach horse had won the race, escorted Mrs. Fischbach and the Fischbach trainer to the winners' circle. Then it was announced that another horse was the winner. Many persons came to Mr. Fischbach and commented on the race. There is not one iota of testimony to show that Mr. Fischbach instigated, encouraged or continued whatever conduct those about him engaged in. There is a statement by Mr. Fischbach, elicited on cross-examination, that he agreed with those about him that his horse had won the race, but there is not one word of testimony by Mr. Fischbach, or by anyone else, that he audibly expressed to those then about him his disagreement with the outcome of the race.

Thereafter, Mr. Fischbach, with his trainer, a Mr. Green, went to the office of the general manager of the Thistledown race track. At that office, and at that time, Mr. Fischbach did in a loud voice (heard only by Mr. Green, his trainer, Mr. Pondfield, the general manager, and Miss Stecki, the stenographer in Mr. Pondfield's office) complain about the race.

According to Mr. Pondfield, the following occurred:

"A. Mr. Fischbach stuck his head in the door of my office, and I said, 'Come in, C. B.'

"He said, 'No, I will wait till you get done.'

"He was with Green at the time, incidentally.

"I said, 'That is all right. You come on in,' because my office is always open to Mr. Fischbach; always has been. He came in, and the first words were 'What the hell kind of a place are you running here?'

"I said, 'C. B., what do you mean? What are you trying to tell me?'

"He went on a lengthy tirade; when the horses passed him, his horse was—mentioned by inches, so much in front, and he knows the picture was dummied, or something happened. He was deprived of the race. I tried to cool him down; tell him things like that can't happen. He said something about the picture was taken before or after the finish line. I went on trying further to cool him down and tell him it is absolutely impossible to take a picture before or after the finish line. We use a slit camera, verticle aperture. It is fixed. You don't move it. You don't follow the horses to take it as they reach the finish line. It would be physically impossible to do anything like that. I tried to reason with him; tried to talk with him.

"In answer to something, he said, 'You keep on doing that and they are going to close up your damn place.'

"I further reasoned with him, and finally ran out of patience. I said, 'You mean to tell me, C. B., you are accusing our officials, our placing judges, the camera, me, my organization, of trying to deprive you of a race?'

"He said, 'I don't give a damn what you think it is. I will never race another horse here,' and walked out. The next morning I wrote the letter."

It is upon a statement similar to the oral testimony of Mr. Pondfield's, set out in a letter to the racing stewards, that they charged Mr. Fischbach with the offense of creating a disturbance and questioning the accuracy of the photo finish camera. (Neither of which charges constitutes an offense within the rules of the Ohio State Racing Commission.)

What, then, is "creating a disturbance," as we liberally interpret these rules? Was Mr. Fischbach's conduct even remotely related to such conduct as "disturbs the peace of any race track enclosure" or to "disorderly conduct"?

The rules set out above, under which the action herein against Fischbach was taken, do not define the offense of disturbing the peace, and there are very few reported cases in Ohio which treat of the subject before us. There is, of course, a relationship between the offense charged herein and breach of the peace and disorderly conduct.

In the case of City of Cleveland v. Thomas Lavelle, et al., decided in the Police Court of Cleveland, 3 O. L. R. 648, that trial court determined that there can be no disorderly conduct in a person following another person and calling him names when such names were not used in a public place. The trial judge in that case stated, at p. 650, that, "in order to constitute disorderly conduct, the offense must be to 'disturb the peace and quiet of the municipality.' That does not mean the entire city, because that would be beyond reason; it must be more than to disturb the peace and quiet of one or a few persons—it must be a neighborhood."

In the case of In re Carroll, 12 W. L. B. 9, a Common Pleas Court in Franklin County said, at page 11:

"The words 'breach of the peace' may be regarded in two senses. Open, active outbreak and violence in the commission of some unlawful act would be the one sense, and the thief who stealthily enters one's house and commits a quiet larceny illustrates the other sense."

I Restatement of the Law of Torts, Sec. 116, says:

"A breach of the peace is a public offense done by violence or one causing or likely to cause an immediate disturbance of public order."

In People v. Most, 171 N. Y. 423, at page 429, that court defined breach of the peace as "an offense well known to the common law. It is a disturbance of public order by an act of violence, or by any act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community." See also: People v. Phillips, 284 N. Y. 235, 30 N. E. 2d 488.

In Town of Ponchatoula v. Bates, 173 La. 824, 138 Sou. 851, the court said:

"* * * A disturbance of the peace may be created by any act or conduct of a person which molests the inhabitants in the enjoyment of that peace and quiet to which they are entitled, or which throws into confusion things settled, or which causes excitement, unrest, disquietude, or fear among persons of ordinary, normal temperament."

In City of Fort Scott v. Arbuckle, 164 Kans. 49, 187 P. 2nd 348, the court said, at page 358:

"* * * What constitutes a disturbance of the peace and quiet of a neighborhood or what constitutes rude behavior or disorderly conduct or boisterous talking so as to constitute a disturbance of the peace depends on the person uttering the language, the person to whom uttered, and all the surrounding facts and circumstances."

In legal textbooks there is no classification known as "disturbing the peace," but reference is always made to "breach of the peace." According to Sec. 1 of Breach of the Peace in 11 C. J. S., the term is generic, "and includes all violations of the public peace or order, or decorum; in other words, it signifies the offense of disturbing the public peace or tranquillity enjoyed by the citizens of a community; a disturbance of the public tranquillity by any act or conduct inciting to violence or tending to provoke or excite others to break the peace; a disturbance of public order by an act of violence, or by any act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community. The word 'peace,' as used in this connection, means the tranquillity enjoyed by the citizens of a municipality or a community where good order reigns among its members."

The same text, in Sec. 3, says that, in the absence of threats or incitement to violence, abusive and insulting language does not constitute a breach of the peace, unless the statute so provides. In the instant case, the rules did not define the offense characterized in those rules as "disturbs the peace." See also: 8 Am. Jur., Breach of Peace, Secs. 6 and 8.

When we consider the testimony in the instant action, with the universal rules with respect to breach of the peace, or, as the rule herein set out, "disturbs the peace," we find that there is no reliable, probative and substantial evidence to justify a finding such as was imposed on Mr. Fischbach in this case.

The judgment herein is reversed; and this court, finding that there was no authority in law or under the evidence to impose the penalty herein, renders final judgment for the appellant, C. B. Fischbach.

Judgment reversed, and final judgment for the appellant.

STEVENS, PJ, DOYLE, J, concur.