**STATE, Plaintiff, v. ROTHSCHILD, Defendant.**

Common Pleas Court, Montgomery County.

No. 1949. Decided February 27, 1958.

Mathias H. Heck, Pros. Atty., By Herbert M. Jacobson and Harold B. LeCrone, Assts., for the State of Ohio.

Cohen, Baron, Druffel & Hogan, By Alfred M. Cohen and Alfred W. Rothenberg, for the defendant.

## OPINION

By MILLS, J.

This cause came on for hearing before the court, a jury having been waived by both the defendant herein and the State of Ohio in open court.

The charge in the information is as follows:

"That on or about the 8th day of Octoiber, 1956, in the County of Montgomery and State of Ohio, aforesaid, one Sylvan Rothschild, did unlawfully exhibit and have under his immediate control a motion picture film, to-wit, Garden of Eden, from the exhibition of which a public disorder is imminent, in that said film does advocate and teach that the violation of §2905.31 R. C., which statute prohibits the practice of nudism in the State of Ohio, as a proper and desirable course of conduct; in violation of the State Laws of Ohio, §2905.342 (B) R. C., contrary to the form of the Revised Code in such case made and provided, and against the peace and dignity of the State of Ohio."

At the request of the prosecuting attorney's office and counsel for the defendant, the court, along with counsel for both the state and the defendant, viewed the picture known as "Garden of Eden," at Loews' Theater just before the testimony was adduced. The film of this picture was then introduced into evidence at the time of trial, and after the trial and after arguments of counsel, the court expressed a desire to hear the dialogue used in connection with the film, and counsel arranged for the film to again be shown. The court, counsel for the state attended the viewing of the film the second time, and counsel thereupon filed their briefs, all of which the court has read.

**Sec. 2905.342 (B) R. C.**, reads as follows:

"No person shall produce, sell, lease, lend, give away or distribute for the purpose of exhibition or exhibit, or have in his possession or under his immediate control for any purpose:

"(A)_____

"(B) Any motion picture film, the exhibition of which has created a public disorder, or from the exhibition of which a public disorder is imminent.

"The exhibition of a motion picture film which teaches or advocates that the violation of any of the criminal laws of the State of Ohio or any of the criminal laws of the United States of America is a proper or desirable course of conduct shall, prima facie, be deemed to create an imminent public disorder for the purpose of initiating the arrest of any person for the violation of this section.

"Whoever violates this section shall be fined not more than five thousand dollars, or imprisoned not more than six months, or both."

Now the statute involved in this case is a misdemeanor statute, §2905.31 R. C., which reads in part as follows:

"No person eighteen years of age or over shall willfully expose his or her private parts in the presence of two or more persons of the opposite sex, or aid or abet any such act, or procure another so to expose his or her private parts, or as owner, manager, lessee, director, promoter, or agent, or in any other capacity knowingly hire, lease, or permit the land, building, or premises of which he is owner or lessor, lessee, or tenant, or over which he has control, to be used for any such purposes.

"Whoever violates this section shall be fined not more than two hundred dollars or imprisoned not more than six months or both."

This statute is known as the statute which prohibits nudism in the State of Ohio and held to be constitutional in the case of **State, ex rel. Church v. Brown, 165 Oh St 31.**

The court finds the facts involved in this case to be as follows:

That during the first week of October, 1956, a drive-in movie was open and in operation at 4249 Germantown Pike in Montgomery County, Ohio; the name of this drive in was "Sunset Cruise-In." Sylvan Rothschild, the defendant herein, was a real estate broker in the City of Cincinnati, Ohio, and incident to that became the manager or the operator of the Sunset Cruise-In from January, 1956 to August, 1957, and was the actual manager or operator during the first week of October, 1956.

On Monday, October 1, 1956, a film delivery service out of Cincinnati, Ohio, delivered a film entitled "The Garden of Eden" to the Sunset Cruise-In and gave it to John Holokan, the projectionist and an employe of Sylvan Rothschild. Rothschild had previously personally previewed this movie and was the one responsible for the actual booking of said movie into the Sunset Cruise-In.

On October 2, 1956, Holokan rewound the film preparatory to showing said film on October 5, 1956 at the Sunset Cruise-In. The Sunset Cruise-In remained dark and was not in operation on Wednesday and Thursday, October 3 and 4, 1956. This was ordered by letter from the

defendant with further instructions that "The Garden of Eden" be shown at the Sunset Cruise-In for the first time on October 5, 1956. On that night the defendant was present at the Sunset Cruise-In and was aware that the movie "The Garden of Eden" was being shown to audiences according to his written instructions.

On the evening of October 5, 1956, the defendant had a conversation at the Sunset Cruise-In with the projectionist, John Holokan, prior to the showing of this movie for the first time, during which conversation Holokan asked the defendant whether or not he (the defendant) didn't think the picture was "kind of rough," to which the defendant replied, "It's a good picture." Holokan then asked the defendant "Whether he (the defendant) thought he could get away with it in view of the picture showing bare breasts of the women." To which the defendant replied, "Sure, it's educational."

Said movie was then exhibited twice on the evening of Friday, October 5, 1956, twice on Saturday evening, October 6 and twice on Sunday evening, October 7, and once again on Monday evening, October 8, 1956. The admission price during the showing of this movie was increased from the usual sixty-five cents (65c) per person to ninety cents (90c) per person as per agreement between the agent of the producer Walter Bibo, and Sylvan Rothschild. The proceeds of the week end showings of October 5, 6, 7, 1956 amounted to approximately $5500.00, which was an "unusually heavy week-end." In fact, they were anywhere from eight to ten times the receipts of a normal week-end at said theater.

During the showings on October 5, 6, and 7, 1956, traffic was quite congested along Germantown Pike with all three lanes of the highway being occupied and cars were even parked along the berm of the road in front of the theater. At different intervals Township constables, the State Patrol, John Holokan and Gary Gemmell, another employee of the theater, were at the scene attempting to direct traffic and to relieve the congestion. At the end of the first showing on Ocober 5, 1956 the intermission lasted thirty (30) minutes as opposed to the usual ten (10) minutes because of traffic congestion of automobiles leaving the theater, which congestion extended from the theater exit to the intersection of Liberty Road and Germantown Pike, a distance of approximately one-quarter of a mile. Under normal conditions the exit of automobiles from the theater would be accomplished in three or four minutes.

After the first showing on October 8, 1956, during the intermission a Detective from the Montgomery County Sheriff's Office confiscated the film and subsequently an information was filed charging the defendant herein with the violation of §2905.342 (b) R. C.

All the above facts were admitted by the opening statement ·of counsel for the defendant or by direct testimony of the defendant himself with the exception of the conversation had with Holokan on October 5, 1956 prior to the first showing of this movie and the traffic congestion. The conversation was denied by the defendant but this was then rebutted by the direct testimony of John Holokan. Traffic conditions were testified to by Holokan and Gemmell in the State's case.

Sec. 2905.342 (B) R. C., which became effective October 6th, 1955,

was passed by the Ohio Legislature after the Supreme Court of Ohio, in RKO Pictures, Inc. v. Department of Education of the State of Ohio, 162 Oh St 263, held that the Ohio Motion Picture Censorship Act, §3305.01 et seq, R. C., was unconstitutional. The Supreme Court of Ohio, however, indicated in this decision that a state might censor motion pictures under a clearly drawn statute.

Sec. 2905.342 (B) R. C., prohibits the exhibition of any motion picture film which has created a public disorder or from the exhibition of which a public disorder is imminent. The statute further provides that for the purpose of inititating the arrest of any person for the violation of this section an exhibition of a motion picture film which teaches or advocates that the violation of any of the criminal laws of the State of Ohio is a proper or desirable course of conduct, shall prima facie, be deemed to create an imminent public disorder.

Now what is a public disorder? It is the opinion of this court a public disorder is what is ordinarily known as a breach of the peace. A breach of the peace is defined as a violation of public order or disturbance of public tranquility. Peace means tranquility which is enjoyed by citizens of a community where good order reigns. Soulis v. Mills Novelty Co. 17 S. C. 869; 198 S. C. 355.

In State v. Langston, 195 S. C. 190, it is held, "peace as used in law in connection with a breach of the peace is the tranquility which is enjoyed by the citizens of the community where good order reigns among its members, which is a natural right of all persons in political society."

In the City of Wellsville v. O'Connor, and others, as reported in 1st Circuit Court Reports, new series, page 253, it is held:

"Peace is a word in common use among the people, and its meaning is well understood by them, and their understanding of its meaning is the same as that of lexicographers; the primary meaning is a state of quiet or tranquility, freedom from disturbance or agitation, calm, repose. It is a tranquility enjoyed by political society internally, by the good order which reigns among its members; a state of public order and decorum."

It is the opinion of this court that a breach of the peace or a public disorder does not necessarily mean the disturbance of the people of the community through loud or boistrous noise and action, or accompanied by firing of guns or loud shouting, or an assault and battery; nor necessarily the violation of a law or ordinance which would hold up traffic unnecessarily for great distances, interferring with the free use of the streets and roads, but the disturbance of a tranquil mind of a person or persons in a community, which would shock the sensibilities of such person or persons, by exhibition of nude persons or nude pictures in the presence of other members of the same or opposite sex at the same time, openly, as in a public theater or other place where people may convene.

For "Breach of the Peace" see the following citations:

In re Carroll 12 Weekly Law Bulletin, 9; 1 Restatement of the Law of Tort, Sec. 116; People v. Most, 171 N. Y. 423, at p. 429; People v. Phillips, 284 N. Y. 235; 30 N. E. 2nd 488; Town of Ponchatoula v. Bates, 173 La. 824; City of Ft. Scott v. Arbuckle, 164 Kans. 49; 11 C. J. S. Sec. 1; 8 Am. Jur., Sec. 6, p. 835; Fischback v. Ohio Racing Com., 76 Abs 540.

It is agreed by counsel and the court that this picture, "The Garden of Eden," is not an obscene motion picture, because there is no exhibition of the genitalia of either sex. However, there was plain exhibition of the naked buttocks and breasts of both sexes, and it was so evident that the people of this nudist colony where the picture was taken, observed the genitalia of both sexes through parading their naked forms in the presence of each other. Some of the New York cases indicate that there is no violation of the rules of common decency in society. However, in Universal Film v. Bell, 167 N. Y. S. 124, 100 Misc. 281, it is held:

"Decency is propriety of action, speech, dress, etc. and what constitutes decency or in other words, what is propriety of action, must be determined by standards in vogue in highly civilized peoples, and not those that may prevail among the Fiji or South Sea Isles. Lewd men and women have no sense of decency, and what may be regarded as decent by one person may not be that regarded by others."

"The matter is obscene, lewd or lascivious within the criminal code if it is offensive to common sense of decency and modesty of community, and tends to arouse or suggest sexual desires or thoughts in minds of those who may be depraved or corrupted thereby." Dysart v. U. S. C. C. A.-Texas, 4 Fed 2—265-766.

This legislation is under what, for lack of a better name, is called the police power of the state, a power incapable of exact definition, but the existence of which is essential to every well ordered government. By means of this power, the legislature exercises supervision over matters involving the common welfare, and enforces the observance, by each individual member of society of the duties which he owes to others and the community at large. It may be exerted whenever necessary to secure the peace, good order, health, morals and general welfare of the community, and the propriety of its exercise within constitutional limits is purely a matter of legislative discretion with which the courts cannot interfere, and the Supreme Court of this state has so held in the case of St. ex rel. Church v. Brown, Secretary of St., 165 Oh St 31; 59 O. O. 45.

However, there is no charge of obscenity or indecency in this information, nor is this an action against the right of censorship of a moving picture film.

The film and the dialogue of "The Garden of Eden" depicts life in a nudist camp and the general benefits derived therefrom. The entire theme from beginning to end, particularly the dialogue and the musical theme teaches and advocates that nudism is a proper course of conduct, in the opinion of this court.

The film opens with the musical theme as follows:

"Let's go sunning, it's so good for you,
Let's go sunning, 'neath the skies of blue
Greet the sun every morn, free and happy as the day you're born,
Let's go native, get out in the sun and play
Be Creative, throw your cares away.
Pretty flowers need the sun, this applies to everyone
Life's worth living, when nature's giving

Happiness to everyone,
So let's go sunning."

The opening scene depicts the lead male character, who is here designated as the father-in-law, choosing murals for a gymnasium which he is donating to "The Garden of Eden Nudist Camp." The dialogue from the lawyer to the father-in-law is to the effect that a great change in personality has taken place in the man now donating the gymnasium. The father-in-law remarks "Yes, I used to be a grouchy old man."

The film then, by flash back technique, explains why and how this change occurred. It is the story of a rapid evolution of the "grouchy old man" into a loving and understanding philanthropist, all brought about by the wonders of nudism.

The plot then unfolds with the daughter-in-law and granddaughter enroute to Miami, Florida becoming stranded unknowingly in the Garden of Eden Nudist Camp near Tampa, Florida. Awakening after a short nap she glances out the window and notices a group of nude children playing. The romantic lead enters the cottage and the following dialogue transpires: Girl: "I've never seen anything so delightfully natural." The girl then notices nude adult figures walking across her line of vision; these are rear view shots showing completely nude males and females. Throughout the film there are full length nude shots from the side and front. Only on the full front shots are the figures covered in some slight manner in the public area by shorts, towels, magazines, dogs, branches or bushes.

Admittedly, no where in the movie, are the adult genitalia shown, although testimony of Walter Bibo, producer of the movie, is that the movie was actually filmed in a nudist camp and that all parties were completely nude during the filming of this picture. However, this action is not based upon obscenity or paragraph "A" of §2905.342 R. C., and the lack of showing the genitalia is therefore irrelevant and immaterial. There can be no other impression that these people parading before the camera are anything but completely nude.

Upon seeing the nude adult figures the girl comments to the effect that even the adults are nude, to which the romantic lead replies "Does that make these bodies any less natural? To walk around as God made them in his image."

Later in the dialogue the girl states "This is a wonderful place for children," to which the boy replies "Yes, of all ages." This occurs at approximately twenty to twenty-five minutes running time. The small daughter of the girl then enters the cottage and in a conversation with her mother states "You are the only one with clothes on, don't you feel funny?"

Later, after agreeing to allow the child to play outside without clothes, the mother ventures forth from the cottage fully clothed and holds a conversation with a reclining nude female, whose breasts are prominently displayed, concerning the mother's desire to go swimming. The mother, after stating that she had no bathing suit, receives a reply from the nude female that "It's nice not having to get into a soggy suit.

Wearing the uniform is more comfortable." The girl queries "Uniform?" and the woman replies, "Yes, nature's clothing. Clothes are so uncomfortable."

Later the father-in-law searches for his daughter-in-law and his grandchild and finds them in this nudist colony. He arrives at night when all parties are fully clothed and in no way, until the following morning, knows that he is in a nudist camp. Upon his discovery of this fact he irately telephones his attorney with instructions to file a custody action to regain custody of his grandchild on the grounds that his daughter-in-law being in a nudist camp constitutes her as an unfit mother. This conversation occurs at approximately fifty to fifty-five minutes running time. He is informed by his counsel that "The Garden of Eden" operates under state law and is perfectly legal, saying, "I myself am a sunbather and have been for many years. I insist you stay there."

The father-in-law then begins a stroll of the grounds viewing all things beautiful, both animate and inanimate and is so impressed by nature in the raw that he, himself, joins the nudist group with a complete change of personality so much so that upon learning that the "Garden of Eden" lacks gymnasium facilities decides to contribute or build a gym for the group. The film flashes back to the opening scene wherein the father-in-law is discussing these plans with his legal counsel and other advisors. Enter here the daughter-in-law and her new husband, the romantic lead, whom she met at the nudist camp.

The dialogue then indicates that all is well between the father-in-law and his daughter-in-law and that not only love but theatrical success has come to the young couple through the guidance of the nudist dramatic group and "The Garden of Eden." Further conversation is had concerning the change of the father-in-law and he states "Yes, if I hadn't followed your advice to join the camp I might never have changed."

All parties present then leave for "The Garden of Eden" and upon arrival the father-in-law confronts a hesitant prospective new male member whom he advises as follows: "Get comfortable, get out of your clothes, it will do you a world of good, I know."

The picture then closes with the musical theme mentioned above and the following credit line:

"With the approval of the American Sunbathing Association and supervised by its executive director."

It is well known that said association is an organization for the fostering and furtherance of nudism.

It is the court's opinion that the entire theme of this movie teaches and advocates that nudism is desirable; "shed your clothes and you shed your inhibitions," and that the showing of this film, "The Garden of Eden" is in violation of §2905.342 (B) R. C., because it advocates nudism and the exhibition of the nude form of both sexes over eighteen years of age in the presence of each other.

This court, therefore, finds the defendant, Sylvan Rothschild, guilty of the charge as set forth in the information filed in this cause.